**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SIERRA CLUB and MINERAL
POLICY CENTER,

        Plaintiffs-Appellees,

v.

EL PASO GOLD MINES, INC.,

        Defendant-Appellant.

MOUNTAIN STATES LEGAL
FOUNDATION,

        Amicus Curiae for
        Defendant-Appellant.

No. 03-1105

(D. of Colo.)

(D.C. No. 01-PC-2163 (OES))

**ORDER**

Before **MURPHY** , **McKAY** , and **TYMKOVICH** , Circuit Judges.

Appellees' petition for panel rehearing filed in this appeal is granted for the

sole and limited purpose of correcting the dates when water samples were taken

from the Roosevelt Tunnel portal. The relevant sentence (page 36) will now read:

Even the Plaintiffs' strongest evidence—that water samples at the shaft

and the tunnel portal (samples taken by Cripple Creek & Victor Mining

Co.) both contain zinc and manganese—is less than convincing given the uncertainties by which the data were collected.

The relevant footnote (footnote 8, page 36) will now read:

*See* supra note 2.  The record contains only two water samples taken at the El Paso shaft.  Although zinc and manganese were detected, no samples link water from the El Paso shaft to water at the Roosevelt Tunnel portal.

In all other respects the petition for rehearing is denied.

The court now reissues a corrected version of the opinion, a copy of which is attached to this order.

Entered for the Court

 /s/ Douglas E. Cressler
Clerk of the Court

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2005**

**PATRICK FISHER**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SIERRA CLUB and MINERAL
POLICY CENTER,

      Plaintiffs-Appellees,

v.

EL PASO GOLD MINES, INC.,

      Defendant-Appellant.

MOUNTAIN STATES LEGAL
FOUNDATION,

      Amicus Curiae for
      Defendant-Appellant.

No. 03-1105

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 01-PC-2163 (OES))**

---

Stephen D. Harris (with Connie H. King and James L. Merrill with him on the briefs)
Merrill, Anderson, King & Harris, LLC, Colorado Springs, Colorado for Defendant-
Appellant El Paso Gold Mines, Inc.

John M. Barth, Hygiene, Colorado (with Paul Zogg, Law Office of Paul Zogg,
Boulder, Colorado, and Roger Flynn and Jeff Parsons, Western Mining Action
Project, Boulder, Colorado, with him on the brief) for Plaintiffs-Appellees Sierra
Club and Mineral Policy Center.

Steven J. Lechner and William Perry Pendley, Mountain States Legal Foundation,
Lakewood, Colorado, on brief for Defendant-Appellant El Paso Gold Mines, Inc.

Before **MURPHY** , **McKAY** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

The Clean Water Act ("CWA" or "Act") prohibits the discharge of any pollutant from a point source unless authorized by a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§ 1311(a), 1342. Under the Act, a "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act also confers jurisdiction on the federal courts to hear citizen suits brought against any person "alleged to be in violation of" the Act. 33 U.S.C. § 1365(a).

The Sierra Club and the Mineral Policy Center ("Plaintiffs") filed a citizen suit in federal district court against a land owner, El Paso Gold Mines, Inc., whose abandoned mine shaft is allegedly discharging pollutants into Cripple Creek, a navigable water under the Act. A magistrate judge, hearing the case by consent, granted the Plaintiffs' motion for summary judgment, and this appeal followed.

On appeal we must decide three questions regarding the application of the CWA to the facts of this case: First, whether the alleged conduct in this case amounts to a "wholly past violation," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc*., 484 U.S. 49, 64 (1987), thus stripping the district court of subject

matter jurisdiction under § 1365(a); second, whether Congress intended to require owners of inactive mines such as El Paso to obtain discharge permits under §§ 1311(a) and 1342; and third, whether the Plaintiffs have met their burden of showing that pollutants actually were discharged into Cripple Creek.

We agree with the magistrate judge on the first two issues, but hold that genuine issues of material fact exist, and, therefore, summary judgment was improperly granted. Accordingly, we reverse and remand the case for further proceedings.

## I. BACKGROUND

### A. Relevant Facts

El Paso owns approximately 100 acres of land west of Colorado Springs, between the towns of Cripple Creek and Victor, in Teller County, Colorado. Founded in 1968, El Paso has never conducted any mining operations on its property, although it may in the future. Located on this property is an inactive gold mine, the El Paso mine, as well as a partially collapsed mine shaft known as the El Paso shaft. The El Paso shaft is a vertical shaft—formerly an elevator shaft used by miners to access various levels of the El Paso mine—that connects the mine to the Roosevelt Tunnel. The Roosevelt Tunnel is a mine drainage tunnel, six miles in length, that was constructed around 1910 to drain groundwater

from the mines in the Cripple Creek Mining District. The Roosevelt Tunnel underlies and connects to numerous properties, including El Paso's.

Snow melt and groundwater make their way to the Roosevelt Tunnel through a series of drainage tunnels and underground shafts, including the El Paso mine shaft. Water also apparently enters and exits the tunnel through cracks and fractures in the rock along the tunnel's six-mile length. The tunnel ends at the Roosevelt Tunnel portal, and here the tunnel discharges water into Cripple Creek, which eventually empties into the Arkansas River. The El Paso shaft connects to the Roosevelt Tunnel approximately two and half miles from the tunnel portal.

*B.        Proceedings in the District Court*

In November 2001, the Sierra Club and the Mineral Policy Center filed a citizen suit against El Paso in federal district court under the Clean Water Act, codified at 33 U.S.C. § 1251 et seq. According to the Plaintiffs, El Paso violated Section 402 of the Act, 33 U.S.C. § 1342, by discharging pollutants (namely, zinc and manganese) from a point source into Cripple Creek without a valid permit.[1]

---

[1] In November 2000, the Plaintiffs filed a separate CWA citizen suit against several active mining companies. *See Sierra Club, et al v. Cripple Creek & Victor Gold Mining, Co.*, Civ. No. 00-MK-2325 (OES) (D. Colo. Nov. 28, 2000). In that case, the Plaintiffs allege the mining companies are liable for violations of the CWA due to discharges occurring at the Roosevelt Tunnel and the Carlton Tunnel (another mine drainage tunnel located in the Cripple Creek mining district).

The district court referred the case to a magistrate judge under 28 U.S.C. § 636(c).

In September 2002, following discovery, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). El Paso argued, first, that the court lacked subject matter jurisdiction over this citizen suit because the Plaintiffs had failed to allege an ongoing violation of the Act. Because it had never engaged in active mining, El Paso argued that it was not "alleged to be in violation of" the Act, a required prerequisite for a citizen suit under Section 505(a)(1), 33 U.S.C. § 1365(a)(1). The magistrate judge disagreed, however, holding instead that this was not a case of "wholly past violations," *Gwaltney*, 484 U.S. at 64, but rather "the continuing migration of pollutants into navigable water was occurring because of a past discharge from a point source." *Sierra Club, et al v. El Paso Gold Mines, Inc.*, Civ. No. 01-PC-2163 (OES), slip op. at 13 (D. Colo. Nov. 15, 2002) ("Order"). In addition, the magistrate judge noted that "there is no evidence that El Paso's intermittent or sporadic violations of the CWA are not likely to recur." *Id.* at 14. Thus, the magistrate judge held that the court had subject matter jurisdiction under Section 505(a)(1) notwithstanding the fact that El Paso had not contributed to the alleged pollution through any of its own mining.

El Paso argued next that purely passive land owners cannot be liable for discharges under Section 301(a), 33 U.S.C. § 1311(a), and therefore they were not

required to obtain a discharge permit pursuant to Section 402, 33 U.S.C. § 1342. This argument was based on the definition of "discharge," which is "any *addition* of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12) (emphasis added). Because the word "addition" implies affirmative conduct by the land owner, El Paso argued it could not, as a matter of law, be liable under the Act. The magistrate judge again disagreed, favoring instead the Plaintiffs' interpretation of the statutory language. According to the magistrate judge, "[t]he key to liability under the CWA is the ownership or operation of a point source which 'adds' pollutants to navigable waters," and liability therefore attaches "not on the activity which results in the point source discharge, but rather on the point source discharge itself." Order at 23–24.

Finally, El Paso argued the Plaintiffs had failed to put forth any evidence establishing a hydrological connection between the El Paso shaft and the Roosevelt Tunnel portal nearly two and half miles away. It was undisputed that water samples taken at the shaft and the portal both contained zinc and manganese.[2] But according to El Paso, there was no evidence linking the water

---

[2] Water samples taken from the El Paso shaft in October 1994 show 4.1 milligrams of zinc per liter (mg/l). Samples taken from the El Paso shaft in November 2000 show manganese of 27.9 mg/l. Samples collected at the Roosevelt Tunnel portal between November 1995 and October 2000 show varying amounts of zinc (between .05 and 3.46 mg/l) and manganese (between .0049 and 39.9 mg/l). This sampling data was collected by Cripple Creek & Victor Gold

(continued...)

from the shaft to water discharged at the portal, and therefore the Plaintiffs had failed to prove El Paso added pollutants to navigable waters.[3] In reviewing this claim, the magistrate judge considered the expert testimonies proffered by the parties. Although the experts disagreed in many respects, the magistrate judge found the experts agreed that "some of the water flowing into the Tunnel from the El Paso shaft reaches the Tunnel portal intermittently and flows into Cripple Creek." *Id.* at 29. Thus, the magistrate judge held that the Plaintiffs had established the necessary hydrological link.

Having rejected each of El Paso's arguments, the magistrate judge granted summary judgment for the Plaintiffs. In a subsequent order, the magistrate judge ordered El Paso to pay $94,900 in civil penalties, as well as attorneys' fees and costs. The magistrate judge also ordered El Paso to apply for an NPDES permit.

C.      *Parallel State Administrative Proceedings*

Concurrent with the federal proceedings described above, the Colorado Water Quality Control Division ("CWQCD") was pursuing an administrative action against El Paso based on the same facts giving rise to the citizen suit. On

---

[2](...continued)
Mining Co., whose property overlies portions of the Roosevelt Tunnel.

[3] The magistrate judge found that Cripple Creek, which accepts Roosevelt Tunnel's discharge, is a "navigable water" under 33 U.S.C. § 1362(7). *See* Order at 16–17. El Paso does not challenge this ruling on appeal, and we therefore accept it as true for purposes of this opinion.

July 25, 2002, the CWQCD issued a Notice of Violation/Cease and Desist Order, alleging that El Paso's "ongoing discharge of pollutants into the Roosevelt Tunnel, and from the Roosevelt Tunnel into Cripple Creek constitutes an unauthorized discharge of pollutants from a point source(s) into state waters." Aplt. App. I, at 242. The CWQCD's case was referred to a state administrative law judge for adjudication. Following discovery, cross-motions for summary judgment, and oral argument, the ALJ issued an initial decision in December 2002, approximately one month after the magistrate judge had granted the Plaintiffs' motion for summary judgment in the federal case.

In the initial decision, the ALJ considered arguments similar to those addressed by the magistrate judge. The ALJ concluded that the Colorado Water Quality Control Act was applicable to point source owners such as El Paso. Thus, as with the federal case, El Paso could be liable for pollutants running out of its mine workings even though it was not currently mining the property. However, contrary to the magistrate judge's conclusion, the ALJ saw no evidence establishing a hydrological connection between the El Paso shaft and the Roosevelt Tunnel portal. The ALJ stated:

> [CWQCD] has failed to prove that the zinc and manganese in the water coming out of the Roosevelt Tunnel portal has its origin in the El Paso Mine. Reliable measuring devices to determine the flow of water in the Roosevelt Tunnel have not been used. This, along with the dramatic drop in zinc and manganese concentrations from the El Paso Shaft to the portal, casts sufficient doubt on whether any of the

zinc and manganese tested at the portal is coming from the El Paso Mine.

Aplt. Supp. App. at 203.

Nevertheless, despite the lack of evidence linking water from the shaft to the tunnel's portal, there was sufficient evidence that the El Paso shaft was discharging pollutants into *state* waters from a point source. *See* Colo. Rev. Stat. § 25-8-501 (2004). The ALJ found that the water in the Roosevelt Tunnel constituted "state waters" as defined in Colo. Rev. Stat. § 25-8-103(19) (2004), and the evidence showed the El Paso shaft was discharging pollutants into those waters. The state of Colorado and El Paso agreed to stay further administrative proceedings until the federal court proceedings had ended. The ALJ's initial decision, therefore, has not been appealed.

*D.    Appellate Proceedings*

Following appellate briefing and oral argument, we became concerned that our decision may interfere with the state's administrative processes. We therefore ordered the parties to brief a number of additional questions regarding the status of the state proceedings and the desirability of a stay of this appeal pending finality by the state. In January 2005, we abated the case, noting in part that the CWA manifests a "pro-federalism thrust" whereby states have the primary role in administration and enforcement. *See* 33 U.S.C. §§ 1251(b), 1342(b) and (c). Nevertheless, because these matters have been pending for some time, we stated

-9-

that if the State of Colorado and El Paso were not able to lift the stay in the state administrative matter and commence further proceedings or settle this matter within ninety days of our order, we would lift our abatement and rule on the merits.

The parties have informed us that the state proceedings have been stayed by agreement of the parties. Settlement and mediation have also been unsuccessful. We therefore agree with the parties that the underlying issues in this case will be advanced by our resolution of this appeal.

## II. ANALYSIS

### A. Subject Matter Jurisdiction for "Wholly Past" Violations

We first address whether the magistrate judge erred in finding that subject matter jurisdiction exists to hear this case. Section 505(a)(1) of the CWA grants citizens the right to bring civil actions against any person "alleged to be in violation of" effluent standards or limitations. 33 U.S.C. § 1365(a)(1). There has been much debate in recent years regarding when a person is "in violation of" the CWA, particularly with respect to whether the defendant must currently be engaged in the polluting practice or, instead, whether jurisdiction lies for past practices that have ceased by the time the suit is filed.

In 1987, the Supreme Court took a step toward resolving the confusion with its opinion in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,

484 U.S. 49 (1987). In *Gwaltney*, the Supreme Court held that Congress, by using the present tense phrase "in violation," did not intend to permit citizen suits based on "wholly past violations" of the CWA. Instead, the Court reasoned that because the language and structure of the citizen suit provision is "primarily forward-looking" or preventative, *id.* at 59, the most natural reading of Section 505(a)(1) requires "citizen-plaintiffs [to] allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57. Thus, to establish jurisdiction, citizen-plaintiffs need only make good-faith allegations of continuous or intermittent violations. *Id.* at 64. Defendants such as El Paso may then challenge the plaintiff's allegations by showing that any violations, *i.e.*, discharges, have ceased and are not likely to recur. "If the defendant fails to make such a showing after the plaintiff offers evidence to support the allegation, the case proceeds to trial on the merits, where the plaintiff must prove the allegations in order to prevail." *Id.* at 66.

*1.*

Although it is now clear that citizen suits cannot be based on effluent violations that occurred entirely in the past, other issues raised by *Gwaltney* remain unresolved. One such issue is presented here: When is a CWA violation "continuous or intermittent" such that it can be characterized as an ongoing

-11-

violation rather than a wholly past violation? Answering this question is particularly difficult in cases such as this where the conduct that gave rise to the violation has ceased, but the *effects* continue.

Some courts, interpreting the CWA and *Gwaltney* expansively, have held that the continuing migration of pollutants from past discharges is sufficient to establish jurisdiction under Section 505(a)(1). *See Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312, 1322 (D. Or. 1997) (holding "a discharge of pollutants is ongoing if the pollutants continue to reach navigable waters, even if the discharger is no longer adding pollutants to the point source itself"); *Werlein v. United States*, 746 F. Supp. 887, 897 (D. Minn. 1990) (holding pollutants from past discharges that are released over time by infiltration of contaminated soil is "ongoing pollution"), *class. cert. vacated by* 793 F. Supp. 898 (D. Minn. 1992).

Other courts, before and after *Gwaltney*, have reached the opposite conclusion, holding that the migration of residual contamination from prior discharges is not an ongoing violation. *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1313 (2d Cir. 1993) ("The present violation requirement of the Act would be completely undermined if a violation included the mere decomposition of pollutants."); *Pawtuxet Cove Marina v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir. 1986) (dismissing citizen suit because

the alleged polluter had ceased operations by the time of the suit); *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985) (dismissing complaint because it "alleges only a single past discharge with continuing effects, not a continuing discharge"); *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 121 (E.D.N.Y. 2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing migrating leachate plume"); *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 969, 975–76 (D. Wyo. 1998) (concluding "that migration of residual contamination from previous releases does not constitute an ongoing discharge"), *factual background stated in* 989 F. Supp. 1159 (D. Wyo. 1998); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1354 (D.N.M. 1995) (finding no ongoing discharge from pile of waste rock on surface); *Brewer v. Ravan*, 680 F. Supp. 1176, 1183 (M.D. Tenn. 1988) (dismissing citizen suit based on allegations made against a permanently closed manufacturing plant).

*2.*

According to El Paso, we lack jurisdiction to hear this case based on this latter set of cases. The El Paso shaft, the argument goes, is merely a conduit through which pollutants from past discharges are alleged to flow. If this were simply a case about the continuing migration of contaminants from a past discharge, El Paso's argument might have some appeal. But contrary to El Paso's characterizations, more is at issue here. Instead, as recognized by the magistrate

judge, the Plaintiffs in this case have alleged "an *ongoing discharge* of pollutants from a point source into navigable waters." Order at 13 (emphasis added). This factual distinction renders the cases cited by El Paso inapplicable.

The ongoing migration cases relied on by El Paso all involve an identifiable discharge from a point source that *occurred in the past*, whether it be a spill, *Wilson*, 989 F. Supp. at 1163, the accidental leakage at a chemical plant, *Hamker*, 756 F.2d at 394, the discharge of lead shot and clay targets at a firing range, *Remington Arms*, 989 F.2d at 1309, or dumping of waste rock at a mine, *LAC Minerals*, 892 F. Supp. at 1337. At the time of suit, the discharging activity *from a point source* in all of these cases had ceased; all that remained was the migration, decomposition, or diffusion of the pollutants into a waterway. In contrast, this case does not involve the mere migration, decomposition, or diffusion of pollutants from an identifiable discharge that occurred sometime in the past. That the mine shaft itself is a point source is not reasonably contestable. Here, the discharge from the point source is occurring now, and is not the result of some past discharge that occurred on the surface of El Paso's property. The Act defines "point source" as, among other things, "any discernible, confined and discrete conveyance, including but not limited to any . . . tunnel [or] conduit . . .

from which pollutants are or may be discharged."[4] 33 U.S.C. § 1362(14). The magistrate judge concluded that the El Paso shaft was a "point source" as defined by the Act, and El Paso does not challenge this determination on appeal. Thus, since plaintiffs have alleged the contemporaneous discharge from a point source—the El Paso shaft—which flows through other conveyances to navigable waters, CWA jurisdiction is established.

Admittedly, our conclusion is largely driven by the unique facts of this case. As alleged by Plaintiffs, the hydrology of the El Paso shaft and Roosevelt Tunnel is such that pollutants continually flow through the rock and mine workings until they reach the shaft, where they are then discharged into the

---

[4] This section reads, in its entirety,

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

The CWA also regulates *nonpoint* source discharges. *See* 33 U.S.C. §§ 1288, 1329. Nonpoint source pollution is not statutorily defined, although it is commonly understood to be pollution arising from dispersed activities over large areas that is not traceable to a single, identifiable source or conveyance. *See League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002). Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting. Thus, absent the El Paso shaft, which is undoubtedly a point source, this case would implicate a different set of issues altogether.

tunnel. The Roosevelt Tunnel, in fact, was originally constructed for the very purpose of draining groundwater from the rock and lowering the water table so that early twentieth century miners could more easily access the desired mineral veins. The shaft and tunnel are therefore working as originally intended, with the unfortunate byproduct being that water which is discharged from the shaft apparently contains some pollutants. The origin of these pollutants is not precisely known, but El Paso has yet to put forth any evidence to rebut the allegation that pollutants are currently discharging and will continue to discharge in the future.

This would be a far different case if there were no point source connection from El Paso's property into the Roosevelt Tunnel. If the Plaintiffs complained only that the pollutants migrated from surface waste piles through the ground to the tunnel, or seeped into the tunnel from naturally occurring mineral deposits in the ground, El Paso's argument as a passive landowner would have considerable force. But here we have a man-made point source that delivers pollutants and continues to discharge them into the Roosevelt Tunnel. These facts distinguish this case from those involving the migration of pollutants from prior discharges.

In sum, the discharge of pollutants at the El Paso shaft is alleged to be recurring and ongoing, and El Paso has not shown any facts that suggest otherwise. Thus, finding the Plaintiffs have made "a good-faith allegation of

continuous or intermittent violation," *Gwaltney*, 484 U.S. at 64, we hold that the magistrate judge did not err in asserting subject matter jurisdiction over this case. In our view, the Plaintiffs have sufficiently alleged that El Paso is "in violation of" effluent standards or limitations under Section 505(a)(1), 33 U.S.C. § 1365(a)(1).

B.      *Liability Under § 402(a) of the CWA for "Discharge" of a Pollutant*

As noted, Section 301(a) of the CWA states that "the discharge of any pollutant by any person shall be unlawful," unless authorized by an NPDES permit. 33 U.S.C. § 1311(a). The CWA sets forth guidelines for the NPDES permits for the discharge of pollutants in Section 402, 33 U.S.C. § 1342. To establish a violation of these sections, a plaintiff must prove that the defendant (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit. *See Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982).

*1.*

In granting the Plaintiffs' motion for summary judgment, the magistrate judge found that each of these elements had been proved. On appeal, El Paso and amicus curiae Mountain States Legal Foundation focus our attention on the first required element, *i.e.*, that the defendant "discharge" a pollutant. As defined by the CWA, the term "discharge of a pollutant" means the "*addition* of any

-17-

pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12) (emphasis added). As explained below, we agree with Plaintiffs that El Paso can be liable under Sections 301(a) and 402 for the "discharge" occurring at the El Paso shaft.

The Plaintiffs cite ample authority from case law for the proposition that discharges from inactive mines can violate the CWA. *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) (holding that the collecting and channeling of surface runoff from inactive mine is "discharge of pollutants"); *American Mining Congress v. EPA*, 965 F.2d 759, 764–66 (9th Cir. 1992) (holding EPA regulation requiring discharge permit for stormwater runoff from inactive mine is reasonable); *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1172–74 (D. Mont. 1995) (holding defendants liable for discharges from inactive mine). Administrative regulations and an EPA policy statement provide further support for this view. *See* 40 C.F.R § 122.26(b)(14)(iii) (stating "active or inactive mining operations" are among the industrial activities that require a stormwater discharge permit under 33 U.S.C. § 1342(p)); EPA Region VIII policy statement, Ref. 8WM-C (Dec. 22, 1993) (stating "discharges from abandoned mine adits are point sources which require a traditional NPDES permit").

But these authorities, which merely establish a rule that inactive or abandoned mining sites are not entirely exempt from NPDES regulation, do little to advance the Plaintiffs' argument. El Paso's argument on appeal is more nuanced. El Paso, as the successor owner to the mining company that constructed the mine shaft point source, argues that it has never conducted *any* mining operations on its property; characterizing itself therefore as a purely "passive landowner." El Paso then argues it cannot be liable for the "discharge" (*i.e.*, addition) of any pollutants. In other words, the issue is not the inactive status of the El Paso mine, but whether the definition of "discharge" requires some affirmative conduct by El Paso. As the magistrate judge recognized, this distinction renders inapplicable the cases cited by Plaintiffs because the defendants in those cases had engaged in active mining operations at some point or participated in the construction of a point source on their property.

*2.*

Our task, then, broadly defined, is to discern whether Congress intended successor owners of a point source to be subject to Section 402's NPDES permitting requirements. "As in all statutory construction cases, we begin with the language of the statute.*" Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). If the statutory language is not ambiguous, and "the statutory scheme is coherent and consistent," our inquiry is at an end. *Id.* (quotation omitted).

However, if the language of the statute is ambiguous, meaning it can be reasonably understood in two or more different senses, *United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002), we must dig further. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The process of statutory construction has been described as "a holistic endeavor," taking into account, at a minimum, the "statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank v. Indep. Ins. Agents of Am.,* 508 U.S. 439, 455 (1993).

We begin, therefore, with the statute's text: Unless authorized by an NPDES permit, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The "discharge of a pollutant," as noted, means the "addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act does not otherwise define the term "addition," and the legislative history is silent on the matter. *See Catskill Mts. Chapter of Trout Unlimited v. City of New York*, 273 F.3d 481, 493 (2d Cir. 2001). "Addition" is

defined by Webster's New International Dictionary (2002) as "the act or process of adding."[5]

El Paso argues the plain meaning of the word "addition" requires affirmative conduct by some actor before liability attaches. Amicus argues further that Congress made unlawful the addition of any pollutant from any point source "*by any person.*" 33 U.S.C. § 1311(a) (italics added). This additional language, argues amicus, shows Congress only meant to penalize active conduct by "persons" that results in a discharge of pollutant, not purely passive owners of a point source. The Plaintiffs, on the other hand, emphasize the determiner "any." Because "discharge" is defined as "*any* addition of *any* pollutant to navigable waters from *any* source," 33 U.S.C. § 1362(12), the Plaintiffs argue the focus of the Act is not on who does the discharging, but rather the fact of discharge.

---

[5] Thus, read together, the Act requires the following:

> "the discharge" (§ 1311)
>> [defined as the "addition" (§ 1362(12))]
>>> [meaning the "act or process of adding" (Webster's)]
>> "of any pollutant" (§ 1362)(12))
>> "to navigable waters" (§ 1362)(12))
>> "from any point source" (§ 1362(12))
>>> [defined as "any . . . channel, tunnel, conduit, well, discrete fissure" (§ 1362(14))]
> "of any pollutant" (§ 1311)
> "by any person" (§ 1311)
> "shall be unlawful." (§ 1311).

Our task in answering this question is made easier by considering the context of the statute. *See United States v. Nichols*, 184 F.3d 1169, 1171 (10th Cir. 1999) (when interpreting statutory language, "appellate courts must examine the . . . language in context, not in isolation"). When viewed as a whole, it is apparent the liability and permitting sections of the Act focus on the point of discharge, not the underlying conduct that led to the discharge. *See, e.g.*, 33 U.S.C. § 1311(e) (stating that effluent limitations established by this section "shall be applied to all point sources or discharge of pollutants"); *id.* at § 1342(a)(1) (stating the EPA may "issue a permit for discharge of any pollutant"); *see also id.* at § 1251(a)(3) (stating "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited"). Furthermore, as the magistrate judge noted, the Act consistently refers to the obligations of the "owners and operators" of a point source, suggesting that successor land owners such as El Paso are covered by the Act's provisions if they are responsible for a functional point source. *See, e.g.*, *id*. at § 1311(g)(2) (providing that "owner or operator" of a point source may apply for modification of permit requirements); *id.* at § 1318(a) (stating that EPA shall require the "owner or operator" of a point source to establish and maintain records and perform other monitoring duties).

Thus, in our view, the Act's language does not exempt successor landowners from liability under Sections 301(a) and 402 for point source

discharges occurring on their land. Although we agree the term "addition" implies affirmative conduct, such a requirement is satisfied by the contemporaneous introduction of polluted water from El Paso's property, through a point source owned and maintained by El Paso, to a navigable stream, Cripple Creek.

Regulations promulgated by the EPA provide some interpretative support. The phrase "addition of any pollutant" is defined as "surface runoff which is collected or channelled by man; discharges through pipes, sewers, or other conveyances *owned by a . . . person* which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works." 40 C.F.R. § 122.2 (emphasis added); *see also* EPA Notice, 55 Fed. Reg. 35248-01 (Aug. 28, 1990) (stating drainage from abandoned mines can be point source pollution where the owner can be found; otherwise, it is nonpoint source pollution). While not a substitute for the CWA's plain language, this regulation reinforces the view that ownership of a point source will trigger liability. Moreover, in a regulation requiring NPDES permits for stormwater runoff from inactive mines, the EPA defines inactive mines as "mining sites that are not being actively mined, *but which have an identifiable owner/operator*." 40 C.F.R. § 122.26(b)(14)(iii) (emphasis added). Again, the focus here is on ownership of the point source, not the discharge-causing conduct.

Significantly, El Paso points to no regulations, and we have found none, which support the view that successor landowners not currently mining their property are exempt from liability where a point source is still discharging pollutants.

*3.*

El Paso does, however, cite some case authority for its position. The Seventh Circuit was faced with a case involving CWA liability for pollutants (silt and sediment) caused by the removal of a 150-year-old dam. In *Froebel v. Meyer*, 217 F.3d 928 (7th Cir. 2000), the court considered whether a landowner, Waukesha County, could be liable under Section 404 of the CWA. Although the county was not involved in the dam's removal, it owned the property on which the dam was located at the time plaintiff filed suit. *Id.* at 932. The plaintiff's theory was that the opening in the dam during demolition became a point source that channeled silt laden water downstream. They argued that Waukesha County needed a permit for the river's now unimpeded flow. *Id.* But the County had nothing to do with the dam's construction, operation, or demolition. The Seventh Circuit stated that the definition of "discharge" under Section 404 "strongly suggest[s] that a Section 404 permit is required only when the party allegedly needing a permit takes some action, rather than doing nothing whatsoever." *Id.* at 938. Thus, the court dismissed the case against the county on the grounds that

"[plaintiff's] claim would essentially require Waukesha County to seek a permit to do nothing but continue to own the land." *Id.* at 939.

Although this case offers some support to El Paso's interpretation of the CWA, we find it unpersuasive for three reasons. First, the portion of the *Froebel* opinion relied on by El Paso interprets Section 404 of the CWA, not Section 402, which is at issue in this case. It is true that the court in *Froebel* was construing the word "discharge," which applies to both CWA sections. But whereas Section 402 addresses the "discharge of any pollutant," Section 404 addresses "discharge of dredged or fill material." 33 U.S.C. § 1344(a). This latter phrase is defined as "any addition of dredged material . . . including redeposit of dredged material other than incidental fallback" into navigable waters. 33 C.F.R. § 323.2(d)(1). The requirement that the alleged violator introduce the pollutants into the water is made clearer by the terms "dredged" and "redeposit," words that do not appear in Section 402. In fact, in *Froebel* the dredged material was already in the navigable waters.

Second, whereas Section 402 focuses on the point source and its ownership, Section 404 emphasizes the "activity" giving rise to the discharge of dredged material, which further distinguishes the two sections. *See, e.g.*, 33 U.S.C. § 1344(e)(1) (stating the EPA may issue permits for "any categories of activities involving discharges of dredged or fill material"); *id.* at § 1344(f)(2) (must obtain

-25-

permit for discharge incidental to "any activity" altering the use of navigable waters). Waukesha County engaged in no "activity" whatsoever.

And finally, the term "discharge of any pollutant" that appears in Section 402 must be understood as defined elsewhere in the Act. *See* 33 U.S.C. § 1362(12) ("the addition of any pollutant to navigable waters from any point source"). The introduction of "point source" into the statutory scheme to define "discharge" and give context to "addition" can only mean that we look to whether the point source is actively adding pollutants to navigable waters. And if the point source is "discharging," the "person" who owns or operates the point source is liable under the Act. In this respect, our holding is not inconsistent with *Froebel.* There, in fact, the court specifically held that the county was not liable under Section 402 because the removed dam was not a point source. *Froebel*, 217 F.3d at 937 (holding that removed dam was not a "point source" because that term "connotes the terminal end of an artificial system for moving water, waste, or other materials"). Here, in contrast, El Paso has conceded that the shaft is a point source.

Thus, we do not find *Froebel* persuasive in this Section 402 case. The better view is that point source owners such as El Paso can be liable for the discharge of pollutants occurring on their land, whether or not they acted in some way to cause the discharge. *See Sierra Club v. Abston Constr. Co.,* 620 F.2d 41,

45 (5th Cir. 1980) (noting in dicta that "[n]othing in the Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water"). This is a case where if you own the leaky "faucet," you are responsible for its "drips."

Our own circuit precedent supports this view. In *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979), we considered whether the unintentional discharge of pollutants from a gold leaching operation violated the CWA. We found that it did. *See id.* at 374. In reaching this conclusion, we noted that the Act was intended to broadly regulate the introduction of pollutants to streams and rivers. Exempting point source owners without a clear exemption from Congress from the requirement to obtain NPDES permits for discharges occurring on their land would undermine a primary objective of the Act. 33 U.S.C. § 1251(a)(1) and (3) (declaration of Congress's goals and policies).

In sum, we hold that point source owners can be liable under Sections 301(a) and 402 of the CWA for unpermitted discharges that occur from their land even if they are not actively mining their property. The magistrate judge, therefore, did not err in holding that El Paso could be liable for discharges occurring at the El Paso shaft.

C. *Hydrological Connection Between El Paso Shaft and Roosevelt Tunnel Portal*

-27-

The final issue before us focuses on fact questions. Did the magistrate judge err in granting summary judgment for the Plaintiffs by finding that the undisputed facts established a hydrological connection between the El Paso Shaft and the Roosevelt Tunnel portal?

We review the grant of summary judgment de novo, applying the same standard as the district court. *Ward v. Utah*, 398 F.3d 1239, 1245 (10th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). When applying this standard, we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (citations and quotation omitted).

The language of the CWA requires a connection or link between discharged pollutants and their addition to navigable waters. *See* 33 U.S.C. §§ 1311(a), 1362(12). As applied here, Plaintiffs have the burden of establishing that pollutants, discharged from the El Paso shaft, actually make their way to the Roosevelt Tunnel portal where they are then discharged into navigable waters

(Cripple Creek, and, ultimately, the Arkansas River).[6] El Paso argues there were dueling expert opinions regarding the source and path of the pollutants, and, thus, the magistrate judge erred in concluding that Plaintiffs had established the necessary hydrological connection. Plaintiffs counter that any factual uncertainties created by the experts were not material to the issue of El Paso's liability under the CWA, and therefore the magistrate judge correctly concluded there were no genuine issues of material fact. We summarize the relevant evidence below.

### 1. Plaintiffs' Evidence

Plaintiffs' expert geologist, Kenneth Klco, filed an expert report opining that "at least some of the water that is conveyed from [El Paso's] property, mine, the El Paso shaft, and related underground workings into the Roosevelt Tunnel is discharged into Cripple Creek at the portal of the Roosevelt Tunnel." Aplt. App. III, at 1366. Klco based his conclusion on site inspections and his review of various documents, maps, and photographs of El Paso's property. In June 2001, for example, Klco conducted an exterior inspection of El Paso's property, noting that the El Paso shaft was surrounded by a large waste rock pile and that the

---

[6] We stress, again, that it is the combination of the El Paso shaft, a point source, and the Roosevelt Tunnel, another point source, that establishes the connection to a navigable stream. This system of infrastructure distinguishes our case from the migration and seepage cases.

property contained "extensive mining disturbances." *Id.* at 1367. On this occasion, he also observed discharge from the Roosevelt Tunnel into Cripple Creek, which he described as "continuous." *Id.* In August 2001, Klco again inspected the interior of the Roosevelt Tunnel. His expert report states that he entered the tunnel from the portal and walked the stretch of the tunnel to a point past the El Paso shaft. Klco observed water continuously flowing from the El Paso shaft area all the way to the portal, and when he reached the shaft, he saw water "raining down" from the shaft and related underground workings. *Id.* at 1368. Beyond the El Paso shaft, Klco observed that the tunnel turned to the northwest and there was no longer a continuous flow of water, although there was intermittent pooling of water on the tunnel floor.

In his deposition, Klco explained further that he observed several instances of water seeping into the tunnel via the ribs or roof of the tunnel in the stretch between the portal exit and the El Paso shaft intersection. He also stated that these seeps are potential sources of pollution because water can pick up pollutants—including zinc and manganese—as it travels through faults and fractures in the rock. Additionally, Klco acknowledged that pollutants, once deposited into the tunnel, may not reach the portal because some water exfiltrates into the tunnel floor. Water and pollutants may also be lost due to evaporation and dilution. In his estimation, however, "better than half" of the water and

pollution discharged at the portal originate on El Paso's property. Aplt. App. II, at 666–67.

The Plaintiffs hired two other experts as well. Robert Burm, an environmental engineer, opined that "the El Paso shaft and the related underground workings serve as conduits that convey water from [El Paso's] property to the Roosevelt Tunnel. In turn, the water is then drained by the Roosevelt Tunnel and is finally discharged into Cripple Creek." *Id.* I, at 262. Ann Maest, an aqueous geochemist, rendered a similar opinion: "[I]t is my opinion that at least some of the metals and other contaminants being discharged into Cripple Creek from the Roosevelt Tunnel are generated from the El Paso Mine, El Paso shaft, and related underground workings." *Id.* IV, at 1483. Both of these experts based their conclusions on Klco's examination of the tunnel, as well as other inspection reports, maps, and diagrams.

Among the significant documents the Plaintiffs' experts relied on was an inspection report by Tom Boyce, a CWQCD inspector who inspected the Roosevelt Tunnel in May 1995. According to Boyce's report, water flowed continuously from the El Paso shaft to the portal, but it fluctuated numerous times from lows of approximately two gallons per minute to highs of approximately 15 gallons per minute. Along the two and a half mile stretch from the portal to the El Paso shaft, Boyce observed there were "dozens" of seeps and "water was

-31-

infiltrating in areas of high porosity and likewise being regenerated by seepage from the walls and ceiling of the tunnel." *Id.* III, at 1423. He also observed that water continued to flow from beyond the El Paso shaft at the same rate and frequency as below the shaft, although the seeps seemed to decrease.[7] Plaintiffs also relied on a January 1995 letter authored by John Hardaway, the environmental affairs manager from a neighboring mine who had conducted numerous inspections of the Roosevelt Tunnel. According to Hardaway, "the first sign of continuous flow toward the portal in the Roosevelt Tunnel usually occurs at about the tunnel's intersection with the El Paso Mine shaft." *Id.* at 1414.

### 2. El Paso's Evidence

El Paso's expert, Robert Brogden, is a hydrologist and groundwater geologist. He opined that the Roosevelt Tunnel and its surroundings comprise complex geology that is poorly understood based on current data. He thus criticizes the Plaintiffs' experts for drawing conclusions with respect to the origin and flow of pollutants at the Roosevelt Tunnel portal based on incomplete information. He states, for example, that "pinpointing an exact source or sources of water that flows from the portal is difficult because of the lack of data that

---

[7] John Hardaway, who accompanied Boyce on the May 1995 inspection, filed an affidavit in which he disagreed with Boyce's observation that water continued to flow from above the El Paso shaft. According to Hardaway, the water they encountered above the shaft was due to backed up water coming from the shaft.

adequately describe the geology and hydrology of the area, and the actual movement of ground water. . . . Considerably more data are required before any quantitative conclusions can be drawn as to the exact sources of water flowing from the portal." Aplt. App. II, at 797. Thus, Brogden does not opine there is *no* hydrological connection between the El Paso shaft and tunnel portal; rather, he asserts that the Plaintiffs' experts have no basis to conclude that such a connection exists.

According to Brogden, the geology of the Cripple Creek area is characterized by two distinct units, the "diatreme" and "country rock." The diatreme, which dominates the region, is a mass of rock composed of volcanic breccia. Because the diatreme is relatively permeable, water flows easily and rapidly through open spaces in the rock. Country rock, on the other hand, is made of granite and other dense forms of rock. Unlike the diatreme, water does not flow freely through the country rock; instead, water only flows through fractures and faults where the rock has been broken. The El Paso shaft is cut into country rock, and the Roosevelt Tunnel cuts through areas of both kinds of rock.

Brogden opined that water discharged from the portal originates from surface precipitation that inflitrates the ground and then moves downward through fractures and faults in the country rock. As water moves downward along the fault lines, it intersects with the El Paso shaft and Roosevelt Tunnel at numerous

-33-

points. Thus, the Roosevelt Tunnel receives inflow along most of its length, and this water originates from a number of properties that overlie the tunnel. Furthermore, according to Brogden, water in the tunnel infiltrates into the tunnel floor before reaching the portal (especially those portions of the tunnel comprising the diatreme). Accordingly, "water probably enters and leaves the Roosevelt several times between the El Paso Mine shaft and the portal," and "it is likely that a large part of the water (at some times, all of the water) that flows from the portal is derived from water that infiltrates into the tunnel between the El Paso Mine shaft and the portal." *Id.* at 795. In sum, some of the water that may enter the tunnel from the El Paso shaft or upward from it, seep out of the tunnel into the groundwater, never reaching the portal exit.

To further support Brogden's conclusions, El Paso points to a July 2001 memo authored by CWQCD personnel. Although the memo notes "the primary source of water entering the Roosevelt Tunnel is the El Paso shaft where it intersects the Roosevelt," it ultimately concludes, consistent with Brogden's report, that "more work needs to be done before the responsible parties can be identified." *Id.* I, at 90. And further:

> The full extent of the underground mine workings probably has not been mapped, and the effects of the workings on the hydrology is uncertain because of the limited information. More information is needed about the underground working of the El Paso Mine and any other mines connected to the El Paso along with ownership.

*Id.* at 91.

El Paso also relies on water sampling data taken from the El Paso shaft in October 1994. The sampling data shows that zinc concentrations in the water decreased dramatically as water flowed towards the portal. Within the first 4,000 feet from the shaft, zinc levels decrease from 4.1 mg/l to .0009 mg/l, representing a 98.85% decrease in less than a quarter of the distance between the shaft and the portal. Approximately half way between the shaft and portal, zinc levels then increased to .916 mg/l. This data, according to El Paso, underscores the complex geology and hydrology of the Roosevelt Tunnel and casts doubt on the Plaintiffs' assertion that pollutants discharged at the portal originate at the El Paso shaft.

### 3. *Genuine Issues of Material Fact*

In granting Plaintiffs' motion for summary judgment, the magistrate judge found that "[t]he experts agree that some of the polluted water conveyed to the Tunnel by means of the El Paso shaft is discharged at the Tunnel portal on an intermittent basis." Order at 31. Accordingly, the magistrate judge concluded the evidence was sufficient to demonstrate that El Paso was discharging pollutants into a navigable water from a point source without an NPDES permit.

El Paso argues on appeal that the magistrate judge did not view the facts favorable to the non-moving party, and we agree. Viewed in the proper light, the Plaintiffs have failed to establish the absence of fact issues necessary to show a

hydrological connection. Although, as the magistrate judge recognized, the experts agree that at least some of the water from the El Paso shaft reaches the portal, there is no agreement regarding whether *pollutants* coming from the shaft are ever discharged at the portal. It may not be a difficult leap to presume that if water makes the two and a half mile journey, then so do pollutants. But this ignores the evidence showing dramatic declines in zinc levels as water flows from the El Paso shaft toward the portal. It further fails to take into account the apparently complex process of infiltration and exfiltration that occurs along the length of the Roosevelt Tunnel. Even the Plaintiffs' strongest evidence—that water samples at the shaft and the tunnel portal (samples taken by Cripple Creek & Victor Mining Co.) both contain zinc and manganese—is less than convincing given the uncertainties by which the data were collected.[8] Viewed in the light most favorable to the nonmoving party, then, there is a genuine issue of material fact regarding the source of pollutants discharged at the portal, and summary judgment was not appropriate.

Our standard for summary judgment bears repeating. At the summary judgment stage, non-movants such as El Paso are given "wide berth to prove a

---

[8] *See* supra note 2. The record contains only two water samples taken at the El Paso shaft. Although zinc and manganese were detected, no samples link water from the El Paso shaft to water at the Roosevelt Tunnel portal.

factual controversy exists." *Jeffries v. Kansas Dep't of Soc. & Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir. 1998) (quotation omitted). Our role is to assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 1228. In this case, the evidence as a whole is not so one-sided that Plaintiffs are entitled to prevail as a matter of law. Nor is this a case where the non-moving party has raised only a "scintilla" of evidence in hopes of creating a factual dispute. *See Simms*, 165 F.3d at 1326. Rather, El Paso has presented compelling and unrebutted evidence that pollutants enter and exit the Roosevelt Tunnel at numerous places along the two and a half mile route from the El Paso shaft to the portal. Whether such evidence stands up under cross-examination or is sufficient to allow El Paso to escape liability is for the trier of fact to decide.

Furthermore, we cannot ignore the larger context of this litigation. Although we do not rely on the findings of the ALJ in the related CWQCD proceedings, we note his observations about the factual complexity of the tunnel geology. Following evidentiary hearings, which included direct expert testimony and cross-examination by both sides, the ALJ found that "[CWQCD] has failed to prove that the zinc and manganese in the water coming out of the Roosevelt Tunnel portal has its origin in the El Paso Mine." Aplt. Supp. App. at 203. Particularly relevant to the ALJ's conclusion was the revelation that reliable

measuring devices and other scientific tools have never been used to determine

the flow of water in the Roosevelt Tunnel. The ALJ noted, for example, that

although CWQCD employees discussed placing recording weirs in the Roosevelt

Tunnel in order to determine how much water was coming down the El Paso

shaft, no such device was ever used. Expert testimony also established that a

flume—which has never been used—would be another method of recording

accurate flows. Nor has any party ever conducted a dye tracing test in order to

determine the path of water in the tunnel.[9] The ALJ also noted that CWQCD's

expert "does not have objective scientific data to explain why the zinc levels drop

so dramatically from the shaft to the portal." *Id.* at 201. As noted above, the

Plaintiffs' experts in this case are similarly silent on this point.[10]

Finally, El Paso has asked us to take judicial notice of a recent ruling by

the district court in parallel litigation brought by the Plaintiffs against several

active mining companies. *See Sierra Club, et al v. Cripple Creek & Victor Gold

Mining, Co.*, *supra* note 1. In a hearing held pursuant to Federal Rule of

Evidence 702, the district court ruled that Kenneth Klco's expert opinions were

---

[9] Counsel for Plaintiffs conceded at oral argument that dye testing, properly conducted, could establish with a high degree of certainty whether pollutants from the El Paso shaft are ultimately discharged at the portal.

[10] On cross-examination, CWQCD's expert testified that the declining levels could be due to dilution of the water by addition of more water into the tunnel or that the zinc could be precipitating out of the water due to changes in pH or changes in the amount of dissolved oxygen.

inadmissible because "Mr. Klco lacks the qualifications to express the opinions and he has not used a sufficiently reliable methodology to formulate them." The opinions offered by Klco in the parallel litigation were essentially identical to those offered here. Nonetheless, our conclusion is based upon our own evaluation of the record before us, and we therefore decline to take judicial notice of the district court's ruling.

## III. CONCLUSION

For the aforementioned reasons, we REVERSE and REMAND to the district court for further proceedings consistent with this opinion.