## STATE OF VERMONT
## SUPERIOR COURT – ENVIRONMENTAL DIVISION

Secretary, Vermont Agency of
Natural Resources,
  Plaintiff,

   v.

Leo Henry, Respondent.

}
}
}
}
}
}
}
}
}
}
}

Docket No. 215-12-10 Vtec
(Administrative Order
enforcement proceeding)

## Decision on the Merits

This matter became the subject of a merits hearing after Leo Henry ("Respondent") filed a timely request for a hearing and gave notice that he wished to contest the December 14, 2010 Administrative Order issued against him by the Secretary of the Vermont Agency of Natural Resources. The Order alleged that Respondent (1) used a failed wastewater treatment system; (2) constructed a new wastewater treatment system without a proper permit; and (3) discharged waste into state waters without a permit, all in violation of applicable statutes and wastewater system rules. When the parties were unable to resolve their disputes voluntarily, the Court set the matter for a site visit and merits hearing.

Respondent was present at the site visit and hearing, joined by his attorney, Ross A. Feldman, Esq.[1] The Vermont Agency of Natural Resources ("ANR") was represented at the site visit and merits hearing by John Zaikowski, Esq., who was joined by ANR staff. Based upon the evidence admitted at the merits hearing, including that which was put into context by a site visit conducted with the parties, the Court renders the following factual and legal determinations, including determinations on ANR's request for imposition of penalties and other relief.

## Factual Findings

1. At all times relevant to the Administrative Order that is at issue in these proceedings, Respondent was the owner of land and improvements located at 2A Greenwoods Road in Alburg, Vermont.

---

[1] Due to Mr. Feldman's relocation out of state after the merits hearing, Robert F. O'Neill, Esq. entered his appearance as Respondent's substitute counsel.

2. Respondent's Greenwoods Road property ("Property") contains certain improvements, including an on-site wastewater treatment system with a septic tank and a gravity-fed, soil-based leach field.

3. Nelson and Joan LaChappelle, who are not named as parties in these proceedings,[2] own a mobile home that is located on Respondent's Property. The LaChappelles and their children use and occupy this mobile home as their primary residence.

4. Respondent and the LaChappelles entered into an agreement whereby Respondent, as landlord, was to receive rent from the LaChappelles, as land tenants, in return for the LaChappelles being allowed to site their mobile home on Respondent's Property and to connect their home to Respondent's on-site wastewater treatment system.

5. Respondent did not regularly visit his Property while the LaChappelle family occupied it.

6. At some point in early 2010 the wastewater treatment system on Respondent's Property stopped serving the LaChappelles' wastewater treatment needs. Mr. LaChappelle thereafter disconnected the drain pipe from the on-site wastewater treatment system that collected waste water from the LaChappelle's bathtub and washing machine. This waste water did not contain waste solids, and we hereafter refer to it as "grey water."

7. Once this grey water drain pipe was disconnected, untreated waste water travelled over the top soil on Respondent's Property and into a nearby unnamed stream. Any storm water or waste water that enters this unnamed stream ultimately flows, untreated, into Lake Champlain. Both the unnamed stream and the Lake are state waters.

8. In response to concerns expressed to ANR staff about a failed wastewater treatment system, ANR Environmental Enforcement Officer ("EEO") Theodore Cantwell visited Respondent's Property on February 9, 2010. EEO Cantwell testified credibly that on this first visit to Respondent's Property, he observed the following:

   a. untreated waste water, including grey water and soap suds, flowing over the top soil and into the unnamed stream;

---

[2] ANR served Mr. & Mrs. LaChappelle with a separate administrative order, which was the subject of a separate enforcement proceeding. See ¶¶ 29–32, below.

b. a grey water drain pipe from the LaChappelles' home that was disconnected from the on-site wastewater treatment system;

c. waste water that had "popped the top" of the septic tank and was flowing onto the surrounding ground; and

d. moist, spongy soils in the vicinity of what was thought to be the location of Respondent's leach field.

9. EEO Cantwell took photos of the site and of the exposed waste water during his February 9, 2010 site visit. Four of those photos were admitted at trial. See Exhibits 3 through 6, inclusive.

10. EEO Cantwell thereafter contacted Respondent, as owner of the Property, and spoke with Respondent about what he had observed and what Respondent would need to do bring his on-site wastewater treatment system into compliance with the applicable rules.

11. As a follow-up and in response to what EEO Cantwell observed on February 9, 2010, EEO Cantwell issued a Notice of Alleged Violation ("NOAV") on February 16, 2010 to Respondent, a copy of which was admitted at trial as Exhibit 8. This NOAV describes the alleged violations of the Vermont Wastewater System and Potable Water Supply Rules (effective Sept. 29, 2007) ("the Wastewater Rules") that were occurring on Respondent's property and what Respondent, as owner of the Property, needed to do to bring the Property into compliance with the Wastewater Rules. The NOAV also advised Respondent that "the Agency may issue an Administrative Enforcement Order" against Respondent. See Exhibit 8.

12. EEO Cantwell next visited Respondent's Property on March 18, 2010. He was accompanied on this second site visit by Assistant Regional Engineer Jessanne Wyman, from the Department of Environmental Conservation ("DEC"), Wastewater Management Division. DEC and its subdivisions are departments of ANR.

13. During this second site visit, EEO Cantwell and DEC Engineer Wyman observed that the grey water drain pipe from the LaChappelle mobile home remained disconnected and that waste water and soap suds continued to flow across the top soil and into the adjacent unnamed stream. They also observed that the lid on top of the septic tank remained "popped" off as a result of waste water overfilling the tank, and that the waste water from the septic tank was flowing in a separate path that joined other waste water flows "in a confluence of waste run-off." Testimony of DEC Engineer Wyman. The photos admitted at trial as Exhibits 10, 11 and 12 show the "grainy,

mucus sludge" that was flowing over Respondent's Property during their second site visit. Id.

14. As a follow up to this second site visit, DEC Engineer Wyman wrote to Respondent by letter dated March 23, 2010 (Exhibit 22) in which she described the surfacing of waste water and flow into the unnamed stream as "both a health hazard and an illegal discharge of wastewater, [that] must be addressed immediately."

15. During both of the site visits and in follow-up letters, EEO Cantwell and DEC Engineer Wyman directed Respondent to take certain remedial measures to limit the health hazard and begin the process of bringing Respondent's Property into compliance with the applicable Wastewater Rules.

16. Neither Respondent nor his tenants complied with the DEC directives. Instead, they allowed waste water to continue to flow, untreated, from the Property into waters of the state.

17. During conversations with DEC Engineer Wyman, Respondent inquired about receiving a permit or other authority to install a second septic tank on the Property, either permanently or as a temporary measure that would allow his tenants to continue to live on the Property while they searched for alternate living arrangements.

18. By letter dated April 22, 2010, DEC Engineer Wyman advised Respondent that she had reviewed Respondent's suggestion of installing a second tank with her Engineering Manager, and that DEC would "**not** approve the addition of another tank even on a temporary basis." Exhibit 23 at 1. By this letter, DEC Engineer Wyman also advised Respondent that he must reconnect the grey water drain pipe and have the existing septic tank pumped on a daily basis for as long as the home remained occupied. DEC Engineer Wyman further advised Respondent that "[w]ithin 10 days of receipt of this letter, [he] must hire a licensed designer to assist [him] in obtaining the Water Supply and Wastewater Disposal System Permit." Id.

19. At some point, Respondent or Mr. LaChappelle reconnected the grey water drain pipe to the on-site wastewater treatment system and had the existing septic tank pumped on one or more occasions. Respondent provided no evidence of his efforts during this period to have a compliant replacement wastewater treatment system designed, permitted, or installed on his Property.

20. EEO Cantwell next visited Respondent's Property on July 23, 2010. During this third site visit, EEO Cantwell took photos of Respondent's Property, concentrating on

4

areas that appeared to have recently been excavated, likely with the use of excavation equipment. Five of those photos were admitted as Exhibits 17 through 21, inclusive. In particular, these photos evidence that earthen fill was installed along the area where the waste water once flowed and that a cylindrical area of earth, 12 feet in diameter, appeared to have been recently disturbed and replaced.

21. Mr. LaChappelle advised that he and Respondent had installed a "dry well" and connected it to the existing septic tank to replace the failed leach field. A dry well is a tank similar to a septic tank, often of a cylindrical shape, that has holes in its sides to allow waste water to leach out.

22. Mr. LaChappelle also advised EEO Cantwell that he and Respondent had also installed an earthen berm so as to limit the flow of waste water into the nearby stream.

23. Neither Respondent nor Mr. LaChappelle applied for nor obtained a permit to authorize the work they completed on the Property.

24. Respondent failed to seek direction from a licensed designer for the replacement system and failed to disclose any replacement wastewater treatment system design to ANR officials prior to actually installing the system.

25. Respondent denies Mr. LaChappelle's admissions to EEO Cantwell that he installed a dry well on the Property. Respondent asserts that he merely reconnected the grey water drain pipe and fixed a pipe that had broken that transmitted waste water from the existing septic tank to the existing leach field. Respondent further asserts that the excavation work he performed "only took twenty minutes" and that the existing leach field worked perfectly after his brief repairs. Respondent's assertions are not credible, given the credible contradictory testimony of EEO Cantwell and Mr. LaChappelle, and the evidence of excavation work depicted in Exhibits 17 through 21.

26. On December 14, 2010, ANR Secretary David Mears issued an Administrative Order ("AO") against Respondent, as the current owner of the Property, directing that Respondent take certain actions to immediately stop the flow of untreated waste water from the Property, to employ a septage hauler to regularly pump the existing septic tank, to employ a licensed designer or engineer to design a proper on-site replacement wastewater treatment system, and to secure a permit for, and then install, the on-site system. A copy of this AO was admitted at trial as Defendant's Exhibit B.

27. Respondent was duly served with the December 14, 2011 AO and thereafter filed a timely request for a hearing with this Court, thereby giving notice that Respondent intended to contest the AO.

28. While this enforcement action was pending, Respondent transferred his Property to Mr. and Mrs. LaChappelle by Quitclaim Deed dated February 25, 2011, which was delivered to the Alburg Town Clerk for recording in the Town of Alburg Land Records on March 4, 2011. See Exhibit 1.

29. On June 17, 2011, Secretary Mears issued an AO against Mr. and Mrs. LaChappelle, as then current owners and occupants of the Property, directing that the LaChappelles take certain actions to immediately stop the flow of untreated waste water from the Property, to employ a septage hauler to regularly pump the existing septic tank, to employ a licensed designer or engineer to design a proper on-site replacement wastewater treatment system, and to secure a permit for, and then install, the on-site system.[3]

30. Mr. and Mrs. LaChappelle were duly served with the June 17, 2011 AO but chose not to file a response with the Court or with ANR.

31. On July 25, 2011, this Court issued an Order enforcing the June 17, 2011 AO against Mr. and Mrs. LaChappelle. See ANR v. LaChappelle, No. 88-6-11 Vtec (Vt. Super. Ct. Envtl. Div. July 25, 2011) (Durkin, J.). No appeal was taken from the July 25, 2011 Order, which has now become final.

32. As of the date of trial on October 23, 2011, neither Respondent nor Mr. and Mrs. LaChappelle had performed the remedial measures required in either AO, other than the reconnection of the grey water drain pipe and an occasional pumping of the existing septic tank.

33. In direct response to the failed system and waste water flows from Respondent's property into waters of the state, EEO Cantwell expended in excess of 60 hours in investigation and response. His salary and benefits cost ANR an average of $29.52 per hour. DEC Engineer Wyman expended in excess of 15 hours in her investigation and response. Her salary and benefits cost ANR an average of $32.00 per hour. EEO Cantwell's and DEC Engineer Wyman's estimates of time expended do not include their time spent preparing for, attending, and testifying at trial.

---

[3] This AO and the Court's subsequent Order enforcing it against Mr. and Mrs. LaChappelle were not offered into evidence during the merits hearing, but the Court has taken judicial notice of the public records in this separate docket.

34. No estimate was provided to the Court of the exact time expended by Attorney Zaikowski and his support staff in preparing, filing, and prosecuting the AO against Respondent, although it was evident at trial that ANR expended considerable legal resources in responding to the discharge of waste water from Respondent's Property into state waters.

**Discussion**

Respondent does not appear to dispute many of the substantive factual allegations ANR presented to the Court in this enforcement proceeding, namely, that there was some failure of the on-site wastewater treatment system on his Property in early 2010 and that his tenants disconnected the grey water drain pipe from the on-site wastewater treatment system, thereby allowing waste water to flow across the Property, untreated, into a nearby stream. There also appears to be no dispute that, for whatever reason, the existing septic tank was filled with raw waste beyond its capacity, so that pressure from the waste popped the exposed lid on the top of the septic tank, thereby allowing waste water to flow from the top of the septic tank, untreated, over the Property and into the nearby stream. Lastly, Respondent did not dispute that he failed to retain a certified designer or engineer to design a replacement wastewater treatment system, to apply for any needed permits, or to install an approved replacement system on the Property he owned at the time of ANR's investigation.

Respondent disputes certain other material facts, all of which we resolve in ANR's favor: that Respondent, sometimes with Mr. LaChappelle's help, excavated portions of the existing on-site septic system, installed a new but unpermitted dry well, and connected that dry well to serve waste stored and flowing from the existing septic tank.

Respondent also raises two legal issues for our review: whether he violated 10 V.S.A. §1259(a) for the discharges of waste water that were caused by his tenants' use of the on-site system on his Property and, if so, whether he may be required under the applicable Wastewater Rules to now take the remedial measures ANR requests. We now address those legal issues.

The applicable statutory prohibition directs that:

> No person shall discharge any waste, substance or material into waters of the state, nor shall any person discharge any waste, substance or material into an injection well or discharge into a publicly owned

7

treatment works any waste which interferes with, passes through without treatment, or is otherwise incompatible with those works or would have a substantial adverse effect on those works or on water quality, without first obtaining a permit for that discharge from the secretary.

10 V.S.A. § 1259(a). This section continues with exceptions that are not relevant to our proceedings here.

Respondent's argument relies upon a narrow reading of § 1259(a). Respondent argues that his tenants, not Respondent, "discharge[d]" the waste water on Respondent's Property. Respondent's argument employs an interpretation of the terms "discharge" and "person" that is based upon both the accepted dictionary definitions of the terms as well as the definitions for those terms included in the Vermont Water Pollution Control statutes. See 10 V.S.A. § 1251(3), (8). But the material facts, the language in § 1259(a), and persuasive analogies from state and federal case law dictate an alternative interpretation from that which Respondent wishes us to adopt.

Respondent's Property included an on-site wastewater treatment system which he allowed his tenants to use when he entered into a land lease agreement. The undisputed facts show that Respondent, as the landowner, provided the on-site wastewater treatment system. When asked at trial whether his tenants had agreed to assume responsibility or liability for the on-site system, Respondent replied that he "had nothing in writing." Respondent provided the on-site system for his tenants' use and did not restrict the use during the tenants' occupancy. This arrangement between Respondent and his tenants conformed to a landlord's responsibilities to a residential mobile home tenant under the Vermont Health Regulations, which have been administered and enforced by the Vermont Agency of Human Services, Department of Health. See Vermont Department of Health Rental Housing Health Code § III(D)(5) ("Owners of rented mobile home lots shall provide hook-up to . . . a properly operating subsurface wastewater disposal system. Each wastewater disposal system shall be operated so that sewage does not back-up into the dwelling, flow to the ground surface or directly into a surface water.").

Respondent's argument focuses on the narrow issue of who was the source of the discharge. There is no dispute that the waste water discharge came from the LaChappelles' use of the on-site system. But § 1259(a) does not narrowly focus on when the waste water discharge first surfaced and who contributed to that discharge;

rather, the statute prohibits the discharge of "any waste . . . into waters of the state." Id. (emphasis added). Thus, the prohibited activity occurred not when the waste water first surfaced on Respondent's Property, but rather when that waste water reached state waters.

Respondent's argument, if followed, would limit ANR's enforcement capabilities to an active discharger. Read as restrictively as Respondent suggests, the statutory prohibition would only apply to one who is holding a drain pipe and is actively directing its discharge. We decline to adopt such a restrictive interpretation of this statute.

We conclude that when a property owner allows another to use his or her property in such a manner that waste discharges into state waters, and then does not timely comply with an ANR notification of the steps he or she must take to stop the unlawful waste water discharge, that property owner has engaged in an unlawful discharge.

The issue of whether § 1259(a) may give rise to a property owner's liability, even when the owner was not on site during the discharge, appears to be one of first impression for this Court and the Vermont Supreme Court. However, our research has revealed an analogous case: ANR v. Irish, 169 Vt. 407 (1999). In ANR v. Irish, a farmer (Mr. Irish) was approached about the possible subdivision of a 26-acre portion of his farm fields. 169 Vt. at 409. The portion contained wetlands that flowed into a nearby brook. Id. Mr. Irish hired an excavator to remove some trees and brush near or in these wetlands and to excavate a drainage ditch. Id. at 410. ANR and municipal officials thereafter complained about the work that Mr. Irish had completed in the wetlands as well as a discharge of silt that was flowing into the nearby brook as a result of the work. Id. ANR and the town ultimately brought enforcement actions against Mr. Irish based, in part, upon a violation of 10 V.S.A. § 1259(a). Id.

Mr. Irish based his denial of liability on several legal arguments, including that he was not aware of the significance of the wetlands on his property and did not intend to discharge waste into state waters. Id. at 411, 416. The Vermont Supreme Court rejected these two arguments and, in doing so, clarified that although one who intends to discharge into state waters must first obtain a permit to do so, the state need not prove "intent" to assert that a property owner violated 10 V.S.A. § 1259(a). Id. at 416; see also 10 V.S.A. § 1263(a) (requiring "[a]ny person who intends to

discharge waste into the waters of the state" to obtain a discharge permit). The Court concluded that Mr. Irish could be held liable for discharges from his property under 10 V.S.A. § 1259(a) even when he did not intend the discharges. See ANR v. Irish, 169 Vt. at 416. Although the Court did not comment on this element of the charge, the Court also effectively concluded that Mr. Irish, as the property owner, could be held liable for discharges caused by the actions of another, the excavator he hired. See id. at 140, 416.

Federal laws also seek to protect designated waters from waste discharge under what is commonly known as the Clean Water Act, 33 U.S.C., Chapter 26. The federal Clean Water Act contains a discharge prohibition that is very similar to 10 V.S.A. § 1259(a); the federal law directs that "the discharge of any pollutant by any person shall be unlawful" unless it is authorized by a National Pollutant Discharge Elimination System, or NPDES, permit. 33 U.S.C. §§ 1311(a), 1342. The Clean Water Act defines the "discharge" of a pollutant or pollutants as the "addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

The 10th Circuit has rejected an argument similar to Respondent's here but based on the federal Clean Water Act. See Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133 (10th Cir. 2005). In El Paso Gold Mines, defendant El Paso Gold Mines, an entity owning property on which there was an inactive gold mine, argued that the Clean Water Act, particularly in its use of the term "addition" in defining discharge, "requires affirmative conduct by some actor before liability attaches." 421 F.3d at 1136, 1143. The 10th Circuit rejected El Paso's argument and concluded that a successor property owner can be liable under the Clean Water Act for a discharge that occurs from his or her lands because when "viewed as a whole . . . the liability and permitting sections of the [Clean Water] Act focus on the point of discharge, not the underlying conduct that led to the discharge." Id. at 1141–43. Thus, the 10th Circuit concluded that El Paso could be held liable under the federal Clean Water Act for ongoing discharges from its dormant mine property even though El Paso had never operated the mine or actively contributed to the discharges from its property.[4] Id. at 1136, 1141, 1146; see also West Virginia Highlands Conservation, Inc. v. Huffman, 625 F.3d 159, 161, 164, 167–68 (4th Cir. 2010) (concluding that a state agency

---

[4] While the 10th Circuit established this legal standard, it reversed the district court's entry of summary judgment against El Paso after concluding that some material facts remained in dispute. El Paso Gold Mines, 421 F.3d at 1149.

conducting reclamation at reclaimed mine sites that had been forfeited to the state needed a NPDES permit despite the fact that the agency was not the root cause for the pollution that was discharging from the sites).

Just as with federal law, Vermont law directs that "[n]o person shall discharge any waste . . . into waters of the state . . . ." 10 V.S.A. § 1259(a). Discharge is defined in 10 V.S.A § 1251(3) as "the placing, depositing or emission of any wastes, directly or indirectly, . . . into the waters of the state." We do not agree with Respondents that this language is distinguishable from that of the federal Clean Water Act. Here, waste water is being "emitted" from respondent's Property into waters of the state similar to the manner in which pollutants were being "added" to navigable waters from El Paso's property in El Paso Gold Mines. See 421 F.3d at 1143.

Our conclusion that Respondent must be held liable for violations of § 1259(a) has further foundation in additional facts, disputed by Respondent, which evidence provided at trial supports.

First, the discharge at issue did not occur solely as a result of Mr. LaChappelle disconnecting the grey water drain pipe from the on-site septic system. Waste was also discharged as a consequence of the on-site septic tank being filled beyond capacity. In failing to regularly pump the on-site septic tank, particularly after ANR gave Respondent specific notice to do so, Respondent allowed waste to overflow from his on-site tank, surface onto his Property, and discharge into state waters.

Second, the evidence shows that Respondent brought excavation equipment onto the Property and conducted work on the wastewater disposal system. Respondent insisted that he did no more than twenty minutes of excavation work limited to the reconnection of a pipe to the leach field. However, Mr. LaChappelle's admission that he assisted Respondent with installing a dry well, and the photos showing disturbed earth on Respondent's Property, bely Respondent's explanation. The most credible evidence leads us to conclude that Respondent replaced the on-site leach field, which had failed and caused a backup of waste water into the septic tank, with an unpermitted dry well. Contributing to our conclusion is Respondent's admission that he requested permission to install a second septic tank, but that ANR declined his request. Respondent's excavation activities followed ANR's rejection of his proposed second septic tank. Respondent took no further efforts to bring his property into compliance with 10 V.S.A. § 1259(a). In fact, his next substantive action

11

concerning the Property was to quitclaim it to his tenants in an apparent effort to absolve himself of his responsibilities to address the failed septic system.

Vermont property owners who wish to discharge waste on their property may do so only after receiving a permit that authorizes them to transmit the waste to an approved on-site wastewater treatment system or to an approved publicly owned wastewater treatment system. 10 V.S.A. § 1259(a). For the reasons stated above, we conclude that Respondent has violated 10 V.S.A. § 1259(a) by discharging waste into state waters without such a permit.

ANR is tasked with administering the waste discharge permit approval process and establishing the rules for such permit applications. 10 V.S.A. § 1259(h). ANR maintains and administers the Wastewater Rules to fulfill this statutory responsibility. ANR has charged Respondent with violations of two material provisions of the Wastewater Rules: first, the use of a failed on-site wastewater disposal system and second, the installation of a replacement system without first obtaining permit approval. Wastewater Rules § 1-303(a)(2), (10). For the reasons stated below, we conclude that Respondent has violated both of these rule provisions.

As defined in the Wastewater Rules, a "failed system" is "a wastewater system that . . . allows wastewater to be exposed to the open air, to pool on the surface of the ground, to discharge directly to surface water . . ." Wastewater Rules § 1-201(a)(25)(A)(i). The existing on-site wastewater treatment system on Respondent's Property fulfilled the definition of a failed system from some time in early 2010 until just prior to EEO Cantwell's third site visit on July 23, 2010. Furthermore, the surfacing of waste only ceased after Respondent installed the unpermitted dry well on his property and hooked it to the overflowing septic tank. Thus, Respondent allowed his tenants to use a failed septic system, refused to follow the multiple directives of ANR officials to cease the use of the failed system, failed and refused to have designed, seek approval for, and install a permitted system, and instead installed an unpermitted dry well as a secondary septic tank.

Since Respondent chose not to offer any evidence to the contrary, we are left to conclude that his violations of the Wastewater Rules continued until he transferred his Property to Mr. and Mrs. LaChappelle in February 2011 by Quitclaim Deed. The unspoken explanation for this transfer was Respondent's effort to avoid liability for the failed system and his self-help measures employed to fix that system. But while

12

Respondent may no longer have legal title and control over his former Property, we know of no legal authority which absolves him of liability for his unlawful discharge of waste, use of the failed on-site wastewater treatment system, and installation and use of an unpermitted replacement wastewater treatment system.[5]

When a respondent seeks a hearing on an ANR administrative order, this Court is charged with (1) determining whether a violation has occurred; (2) affirming, modifying, or reversing any provision of the administrative order; and (3) reviewing and determining anew the amount of any penalty to be assessed against the respondent. See 10 V.S.A. § 802(b). As stated above, we conclude that Respondent has violated 10 V.S.A. § 1259(a) by discharging waste into waters of the state and has also violated the applicable provisions of the Wastewater Rules by using a failed on-site system and using an unpermitted on-site system in connection with his leasing of the Property to Mr. and Mrs. LaChappelle. Respondent authorized his tenants to use the on-site wastewater treatment system, was put on notice shortly after the system on his Property failed, and refused to comply with ANR's repeated directives to cease the unlawful discharge of waste and use of unpermitted systems on his Property. Respondent chose to avoid the cost of remedying the failed system and instead transferred the Property to the LaChappelles, presumably under the mistaken impression that his transfer would absolve him of liability.

Having concluded that Respondent committed the violations at issue, we turn next to determining what penalty, if any, should be assessed against him. We are guided in fulfilling this responsibility by the provisions of 10 V.S.A. § 8010(b), which provides that

> In determining the amount of the penalty, the secretary [of ANR in the first instance and this Court when a hearing is requested[6]] shall consider the following:
>
> (1) the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation;
>
> (2) the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement;

---

[5] We note that by virtue of the June 8, 2011 AO and this Court's Order of July 25, 2011, Mr. and Mrs. LaChappelle have been directed to cease any waste discharges on the Property, to cease the use of the unpermitted on-site system, to have a proper replacement system designed, to obtain a permit for and install that replacement system, or to vacate the property. See June 8, 2011 AO at 3–5, ¶¶ A—K.

[6] See 10 V.S.A § 8012(b)(4).

(3) whether the respondent knew or had reason to know the violation existed;

(4) the respondent's record of compliance;

. . ..

(6) the deterrent effect of the penalty;

(7) the state's actual costs of enforcement; and

(8) the length of time the violation has existed.[7]

In applying these standards, we note that (a) the raw waste discharge from Respondent's Property caused significant potential harm to public safety; (b) Respondent had actual knowledge of the existing violations and contributed to additional violations after receiving ANR's timely and multiple notifications; (c) Respondent chose not to comply with ANR directives, but rather to quitclaim the Property without first rectifying the violations; (d) the violations existed from early 2010, had not been resolved by the time of trial, and may continue to this day; and (e) ANR incurred significant expenses in its efforts first to convince Respondent to rectify the discharge violations on his Property and then to prosecute Respondent once it became clear that Respondent had refused to abide by ANR's directives. For these reasons, we conclude that a significant penalty, totaling **$18,000.00,** is warranted. Such a penalty is necessary because of the seriousness of Respondent's violations and the need to create a significant deterrent to Respondent's disregard of the applicable wastewater discharge statutes and the Wastewater Rules.

## Conclusion

For the reasons stated above, we conclude that Respondent Leo Henry violated the Vermont Water Pollution Control provisions in 10 V.S.A. § 1259(a) and the provisions of the Vermont Wastewater System and Potable Water Supply Rules (effective Sept. 29, 2007) that prohibit the use of a failed wastewater disposal system and the use of an unpermitted disposal system, Wastewater Rules §1-303(a)(2) and §1-303(a)(10). As a consequence of these violations, and pursuant to the authority of 10 V.S.A. §8012(b)(5), we hereby modify the Administrative Order ANR Secretary David Mears issued against Respondent Leo Henry, dated December 14, 2010, as follows:

1. The Court's independent determination is that Respondent shall pay a penalty of **$18,000.00** to ANR no later than thirty (30) days following the

---

[7] We note that, given the level of the penalty we assess, the penalty limitations of 10 V.S.A. § 8010(c) do not apply here.

date on which this Decision and the accompanying Judgment Order become final (finality being defined as either 10 (ten) days after this Decision and Judgment Order are received, or once any appeal is dismissed or resolved);

2. The injunctive relief and specific performance directed by paragraphs (B) through (L), inclusive, in the ANR Secretary's December 14, 2010 Administrative Order are hereby **VACATED**, given that Respondent Leo Henry quitclaimed his entire interest in the subject Property; and

3. Nothing contained in this Decision or the accompanying Judgment Order shall be regarded as a waiver or bar of any responsibility or liability that Respondent may have to his former tenants, Nelson and Joanne LaChappelle, in connection with the discharge of waste, failed on-site system or installation of the unpermitted dry well.

### Rights of Appeal (10 V.S.A. §§ 8012(c)(4) and (5))

**WARNING:** This Merits Decision and the accompanying Judgment Order will become final if no appeal is requested **within 10 days** of the date this Merits Decision and Judgment Order are received. All parties to this proceeding have a right to appeal. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in the Vermont Rules for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Merits Decision and Judgment Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Vermont Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Vermont Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

A Judgment Order accompanies this Decision. This concludes the current proceedings before this Court in this enforcement action.

Done at Newfane, Vermont this 13th day of March, 2012.

_____
Thomas S. Durkin, Environmental Judge

15