BARBARA MILANO KEENAN, Circuit Judge:
 

 In late 2014, several hundred thousand gallons of gasoline spilled from a rupture in a pipeline owned by Plantation Pipe Line Company, Inc., a subsidiary of Kinder Morgan Energy Partners, LP (collectively, Kinder Morgan), near Belton, South Carolina. It is undisputed that the gasoline has seeped into nearby waterways, and the plaintiffs allege that the gasoline has continued to travel a distance of 1000 feet or less from the pipeline to those "navigable waters."
 

 Two plaintiff conservation groups brought a "citizen suit" under the Clean Water Act (the CWA, or the Act),
 
 33 U.S.C. §§ 1251
 
 - 1387, alleging that Kinder Morgan was in violation of the Act for polluting navigable waters without a permit and seeking relief to remediate the ongoing pollution. This case requires us to determine whether citizens may bring suit alleging a violation of the CWA when the source of the pollution, the pipeline, is no longer releasing the pollutant, but the pollutant allegedly is passing a short distance through the earth via ground water and is being discharged into surface waterways.
 

 The district court held that it lacked subject matter jurisdiction under the CWA, because the pipeline has been repaired and the pollutants currently pass through ground water to reach navigable waters. We conclude that the district court erred in holding that it lacked jurisdiction, because citizens may bring suit under
 
 33 U.S.C. § 1365
 
 (a) for discharges of pollutants that derive from a "point source" and continue to be "added" to navigable waters. We further hold that the plaintiffs have stated a valid claim for a discharge
 under the CWA. Accordingly, we vacate the district court's judgment, and remand for further proceedings consistent with this opinion.
 

 I.
 

 A.
 

 In 1972, Congress enacted the CWA to eliminate the discharge of certain pollutants or "effluents" into the "navigable waters" of the United States.
 
 See
 

 S. Appalachian Mountain Stewards v. A & G Coal Corp.
 
 ,
 
 758 F.3d 560
 
 , 563 (4th Cir. 2014) ;
 
 Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.
 
 ,
 
 268 F.3d 255
 
 , 264-65 (4th Cir. 2001). The CWA's stated purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
 
 33 U.S.C. § 1251
 
 (a). The federal government's prior regime of water pollution control focused primarily on measuring direct injuries to the Nation's waters using water quality standards.
 
 Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.
 
 ,
 
 204 F.3d 149
 
 , 151 (4th Cir. 2000) (en banc) [
 
 Friends of the Earth II
 
 ]. In the CWA, however, Congress shifted its regulatory focus for water pollution from water quality standards to limiting discharges of pollutants.
 
 See
 

 id
 
 . One of the CWA's central provisions establishes that "the discharge of any pollutant by any person shall be unlawful."
 
 33 U.S.C. § 1311
 
 (a).
 

 The Act authorizes exceptions to this general prohibition in the form of permits issued in accordance with the National Pollutant Discharge Elimination System (NPDES), which allows limited discharges.
 
 See
 

 33 U.S.C. §§ 1311
 
 (a), 1342 ;
 
 S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians
 
 ,
 
 541 U.S. 95
 
 , 102,
 
 124 S.Ct. 1537
 
 ,
 
 158 L.Ed.2d 264
 
 (2004) ("[T]he NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants.");
 
 Friends of the Earth II
 
 ,
 
 204 F.3d at 151
 
 . Both the Environmental Protection Agency (EPA) and state environmental control agencies may issue NPDES permits.
 
 See
 

 Friends of the Earth II
 
 ,
 
 204 F.3d at 152
 
 . However, consistent with the CWA's general prohibition, a polluter does not violate the statute only when it exceeds limitations in its permit. Instead, a polluter also may be in violation of the statute due to a discharge for which the polluter could not have obtained
 
 any
 
 permit.
 
 See
 

 Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.
 
 ,
 
 73 F.3d 546
 
 , 561 (5th Cir. 1996) ("Nothing in the CWA limits a citizen's right to bring an action against a person who is allegedly discharging a pollutant without a permit solely to those cases where EPA has promulgated an effluent limitation or issued a permit that covers the discharge.").
 

 The CWA authorizes both citizens and government agencies to enforce the Act's provisions. Citizen suits under the CWA have the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance."
 
 Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.
 
 ,
 
 484 U.S. 49
 
 , 62,
 
 108 S.Ct. 376
 
 ,
 
 98 L.Ed.2d 306
 
 (1987). The Act contains the following citizen suit provision:
 

 [A]ny citizen may commence a civil action on his own behalf-
 

 (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is
 
 alleged to be in violation of
 
 ... an effluent standard or limitation under this chapter....
 

 33 U.S.C. § 1365
 
 (a) (emphasis added). An "effluent standard or limitation" is defined to include the Act's central prohibition on
 the "discharge of any pollutant" without a permit.
 
 See
 

 33 U.S.C. §§ 1365
 
 (f), 1311(a).
 

 The Act sets forth a technical definition of the term "discharge of a pollutant," which is defined expansively to include "any addition of any pollutant to navigable waters from any point source."
 
 [1]
 

 33 U.S.C. § 1362
 
 (12)(A). A "point source" in turn is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container...."
 
 33 U.S.C. § 1362
 
 (14). The term "navigable waters" is defined in the CWA as "the waters of the United States."
 
 33 U.S.C. § 1362
 
 (7). The Supreme Court has interpreted the term "navigable waters" to mean more than waters that are navigable-in-fact, and to include, for example, wetlands and related hydrological environs.
 
 See, e.g.
 
 ,
 
 Rapanos v. United States
 
 ,
 
 547 U.S. 715
 
 , 730-31, 735,
 
 126 S.Ct. 2208
 
 ,
 
 165 L.Ed.2d 159
 
 (2006) (plurality opinion) (observing that navigable waters include more than traditionally navigable waters and may include certain wetlands);
 
 United States v. Riverside Bayview Homes, Inc.
 
 ,
 
 474 U.S. 121
 
 , 133,
 
 106 S.Ct. 455
 
 ,
 
 88 L.Ed.2d 419
 
 (1985) ("Congress chose to define the waters covered by the Act broadly.").
 

 B.
 

 The plaintiffs Upstate Forever and the Savannah Riverkeeper
 
 [2]
 
 (collectively, the plaintiffs) allege that in late 2014, over 369,000 gallons of gasoline spilled from Kinder Morgan's underground pipeline, which extends over 1100 miles through parts of the eastern United States. In December 2014, citizens in Anderson County, South Carolina, discovered dead plants, a petroleum odor, and pools of gasoline in the vicinity of the pipeline. The plaintiffs allege that gasoline and gasoline toxins have seeped and continue to seep into ground water, wetlands, and waterways in Anderson County and the Savannah River watershed. They allege that although a reported 209,000 gallons were recovered by the end of 2015, no significant amount of contaminants has been removed since that time. Consequently, at the time that the plaintiffs filed their complaint, at least 160,000 gallons allegedly remained unrecovered. Kinder Morgan repaired the pipeline shortly after the initial spill.
 

 When Kinder Morgan's pipeline broke six to eight feet underground, gasoline and related contaminants spilled out into soil and ground water. The plaintiffs allege that these contaminants are seeping into two nearby tributaries of the Savannah River, Browns Creek and Cupboard Creek, and their adjacent wetlands. The pipeline broke less than 1000 feet from Browns Creek and its adjacent wetland, and 400 feet from Cupboard Creek and a second wetland. Both waterways and the wetlands are downgradient from the spill site. The plaintiffs allege that gasoline pollutants from the pipeline are seeping into navigable waters as defined by the CWA, including the above two creeks in Anderson County, Broadway Lake, Lake
 Secession, Lake Russell, and the Savannah River.
 
 [3]
 

 The plaintiffs allege that a "plume" of petroleum contaminants continues to migrate into these waterways years later through ground water and various natural formations at the spill site, including "seeps, flows, fissures, and channels." Hazardous gasoline contaminants have been detected on several occasions at the spill site in ground water wells. Contaminants were also detected in Browns Creek as early as January 2015, and additional tests in Browns Creek have reported high levels of contaminants on several later dates in 2015 and in 2016.
 

 Kinder Morgan has implemented certain remediation and recovery measures under the guidance of the South Carolina Department of Health and Environmental Control (DHEC). DHEC is the agency authorized to issue NPDES permits and oversee water quality in South Carolina.
 
 See
 

 Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.
 
 ,
 
 629 F.3d 387
 
 , 390 (4th Cir. 2011) [
 
 Friends of the Earth III
 
 ]; S.C. Code § 48-1-100(B).
 

 The plaintiffs allege that Kinder Morgan has failed to comply fully with DHEC's abatement instructions. They claim that although DHEC instructed Kinder Morgan to test for pollution in March 2016, Kinder Morgan only began that additional testing after the plaintiffs made their own visit to the spill site in August 2016. The plaintiffs further allege that their testing conducted in August 2016 revealed that the levels of gasoline contaminants in Browns Creek actually were increasing almost two years after the spill. During their August 2016 visit to the area, oil sheens were visible on the surface of Browns Creek, and devices used to absorb the oil had not been maintained and were saturated with oil.
 

 Kinder Morgan allegedly delayed by six months its submission to DHEC of the required site remediation plan and site assessment, and also refused to comply with another of DHEC's water sampling requests. Publicly available data on DHEC's website indicate that DHEC sampled surface waters at Browns Creek in February 2017 and found pollutants at three locations, each of which is being remediated. South Carolina Department of Health and Environmental Control,
 
 Surface Water Sampling Event
 
 , http://www.scdhec.gov/HomeAndEnvironment/Pollution/CleanUpPrograms/OngoingProjectsUpdates/PlantationPipeline/SurfaceWaterSamplingEvent/ (last visited Apr. 11, 2018).
 

 The plaintiffs filed this suit in December 2016, alleging discharges of gasoline and gasoline pollutants without a permit, in violation of the CWA under
 
 33 U.S.C. § 1311
 
 (a).
 
 [4]
 
 The complaint includes allegations that the pipeline ruptured and caused a discharge that has polluted, and continues to pollute, navigable waters by seeping from a point source over a distance of 1000 feet or less through soil and ground water to nearby tributaries and wetlands. The plaintiffs thus allege in their complaint two interrelated violations of the CWA: (1) that Kinder Morgan has caused discharges of pollutants from point sources to navigable waters without a permit; and (2) that Kinder Morgan has caused discharges of pollutants
 that continue to pass through ground water with a "direct hydrological connection" to navigable waters. The plaintiffs also allege that the remediation actions taken to date by Kinder Morgan have been insufficient to abate the pollution, and seek damages, declaratory relief, and injunctive relief requiring that Kinder Morgan take further measures to control and abate the spill.
 

 Kinder Morgan moved to dismiss the plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, contending both that the district court lacked subject matter jurisdiction and that the plaintiffs had failed to state a claim for relief. Addressing first the sufficiency of the plaintiffs' pleadings, the district court held that the plaintiffs had failed to state a claim because the pipeline had been repaired and no longer was discharging pollutants "directly" into navigable waters. The court also held that it lacked subject matter jurisdiction over the complaint, stating that the CWA did not encompass the movement of pollutants through ground water that is hydrologically connected to navigable waters. Accordingly, the court dismissed the plaintiffs' complaint on both grounds. The plaintiffs timely noted this appeal.
 

 II.
 

 On appeal, the plaintiffs contend that the district court erred in determining that the continuing addition of pollutants to navigable waters is not an ongoing violation of the CWA because the pipeline has been repaired. According to the plaintiffs, a claim for a discharge of a pollutant, in violation of
 
 33 U.S.C. § 1311
 
 (a), need not allege that the pollutant is being discharged
 
 directly
 
 from the point source into navigable waters. They assert that the CWA also prohibits the discharge of pollutants from a point source through ground water that has a direct hydrological connection to navigable waters.
 

 In response, Kinder Morgan contends that the district court did not err because the violation ceased once the pipeline was repaired. Alternatively, Kinder Morgan asserts that if seepage is ongoing, the pollution is seeping from nonpoint sources, namely, from natural formations at the spill site. Kinder Morgan also argues that discharges into navigable waters from hydrologically connected ground water do not fall within the CWA's definition of a "discharge of a pollutant" in
 
 33 U.S.C. § 1362
 
 (12)(A). We disagree with Kinder Morgan's position.
 

 A.
 

 We review de novo the district court's dismissal of the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).
 
 Greenhouse v. MCG Capital Corp.
 
 ,
 
 392 F.3d 650
 
 , 655 (4th Cir. 2004) ;
 
 Richmond, Fredericksburg & Potomac R.R. Co. v. United States
 
 ,
 
 945 F.2d 765
 
 , 768-69 (4th Cir. 1991). A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)"only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."
 
 Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.
 
 ,
 
 166 F.3d 642
 
 , 647 (4th Cir. 1999) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "provide[ ] sufficient detail [ ] to show that he has a more-than-conceivable chance of success on the merits."
 
 Owens v. Balt. City State's Attorneys Office
 
 ,
 
 767 F.3d 379
 
 , 396 (4th Cir. 2014) (citation omitted).
 

 As a threshold matter, a court first must determine whether it has jurisdiction to entertain a claim.
 

 Steel Co. v. Citizens for a Better Env't
 
 ,
 
 523 U.S. 83
 
 , 88-89,
 
 118 S.Ct. 1003
 
 ,
 
 140 L.Ed.2d 210
 
 (1998). A court's determination of subject matter jurisdiction addresses whether the court has the authority to entertain a particular kind of case, not whether a claim for relief is viable under a particular construction of a statute.
 
 See
 

 id.
 

 at 89
 
 ,
 
 118 S.Ct. 1003
 
 . Unless Congress has "clearly state[d] that [a statutory limitation] is jurisdictional ... courts should treat the restriction as nonjurisdictional in character."
 
 Sebelius v. Auburn Reg'l Med. Ctr.
 
 ,
 
 568 U.S. 145
 
 , 153,
 
 133 S.Ct. 817
 
 ,
 
 184 L.Ed.2d 627
 
 (2013) (citations and internal quotation marks omitted).
 

 In the present case, the primary issue we consider is whether an indirect discharge of a pollutant through ground water, which has a direct hydrological connection to navigable waters, can support a theory of liability under the CWA. Because our answer to this question largely depends on our construction of the statutory term "discharge of a pollutant," the question ordinarily would not be jurisdictional in nature.
 
 [5]
 
 However, because courts have "jurisdiction" over CWA citizen suits only if the complaint alleges an ongoing violation,
 
 Gwaltney
 
 ,
 
 484 U.S. at 64
 
 ,
 
 108 S.Ct. 376
 
 , we must address the question of an ongoing violation before proceeding further in this case. Accordingly, we first address whether the plaintiffs have alleged an ongoing violation and, if so, whether they sufficiently have alleged a nexus between the source of the pollution and navigable waters to state a claim for discharge of a pollutant under the CWA.
 
 See
 

 Steel Co.
 
 ,
 
 523 U.S. at 88-90
 
 ,
 
 118 S.Ct. 1003
 
 .
 

 B.
 

 The CWA authorizes citizens to seek injunctive relief only to abate a "continuous or intermittent" violation.
 
 Gwaltney
 
 ,
 
 484 U.S. at 64
 
 ,
 
 108 S.Ct. 376
 
 ;
 
 Friends of the Earth III
 
 ,
 
 629 F.3d at 402
 
 ("We have instructed that a citizen plaintiff can prove an ongoing violation ... by proving violations that continue on or after the date the complaint is filed." (citation omitted)). Conversely, when a violation of the CWA is "wholly past," the federal courts do not have jurisdiction to entertain a citizen suit, even if the past discharge violated the CWA.
 
 Gwaltney
 
 ,
 
 484 U.S. at 64
 
 ,
 
 108 S.Ct. 376
 
 . As we already have noted, the CWA's citizen suit provision is intended primarily to allow citizens "to abate pollution when the government cannot or will not command compliance."
 

 Id.
 

 at 62
 
 ,
 
 108 S.Ct. 376
 
 ;
 
 cf.
 

 Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n
 
 ,
 
 453 U.S. 1
 
 , 17 n.27,
 
 101 S.Ct. 2615
 
 ,
 
 69 L.Ed.2d 435
 
 (1981) ("[P]rivate enforcement suits were intended [often] to be limited to [ ] injunctive relief."). The citizen suit provision thus enables citizens to seek abatement of polluting discharges to further the CWA's central purpose, namely, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
 
 33 U.S.C. § 1251
 
 (a).
 

 In
 
 Gwaltney
 
 , the Supreme Court emphasized that the CWA, like other environmental statutes, authorizes "prospective relief" that only can be attained while a violation is ongoing and susceptible to remediation.
 
 484 U.S. at 57
 
 ,
 
 108 S.Ct. 376
 
 ;
 
 see also, e.g.
 
 ,
 
 15 U.S.C. § 2619
 
 (a)(1) (authorizing
 citizen suits against persons "alleged to be in violation of" the statute);
 
 42 U.S.C. § 6972
 
 (same). We applied the principles of
 
 Gwaltney
 
 in our decision in
 
 Goldfarb v. Mayor of Baltimore
 
 , holding that a claim of an ongoing violation supported a citizen suit under the Resource Conservation and Recovery Act of 1976 (RCRA), Pub. L. No. 94-580,
 
 90 Stat. 2796
 
 (1976) (codified as amended at
 
 42 U.S.C. §§ 6901
 
 - 6992k ), under a provision that is "identical" to the citizen suit authorization in the CWA.
 
 791 F.3d 500
 
 , 513 (4th Cir. 2015).
 

 The plaintiffs in
 
 Goldfarb
 
 alleged that the City of Baltimore had stored hazardous chemicals, which had leaked from the point of storage and had continued to migrate through the soil in violation of the RCRA's permitting standards.
 

 Id.
 

 at 512
 
 . In response to the City's contention that any RCRA violations were wholly past under the rationale of
 
 Gwaltney
 
 , we observed that "although a defendant's
 
 conduct
 
 that is causing a
 
 violation
 
 may have ceased in the past ... what is relevant is that the
 
 violation
 
 is continuous or ongoing."
 
 See
 

 id.
 

 at 511-13 (citing
 
 S. Rd. Assocs. v. IBM Corp.
 
 ,
 
 216 F.3d 251
 
 , 255 (2d Cir. 2000) ). Accordingly, we held that the plaintiffs had alleged an ongoing violation of the RCRA.
 

 Id.
 

 Our analysis in
 
 Goldfarb
 
 regarding an ongoing violation is equally applicable here.
 
 [6]
 
 Nothing in the language of the CWA suggests that citizens are barred from seeking injunctive relief after a polluter has repaired the initial cause of the pollution. When interpreting a statute, we attend first to the statute's plain language.
 
 United States v. Ide
 
 ,
 
 624 F.3d 666
 
 , 668 (4th Cir. 2010). Like the RCRA, the CWA's plain language requires only that the citizen allege that the polluter "be in violation of" an "effluent standard or limitation" under the Act.
 
 33 U.S.C. § 1365
 
 (a) ;
 
 see
 

 Goldfarb,
 

 791 F.3d at 512-13
 
 . As noted above, an "effluent limitation" of the CWA includes any unpermitted "discharge of a pollutant."
 
 33 U.S.C. §§ 1365
 
 (f), 1311(a). Accordingly, the relevant violation here is the discharge of a pollutant, defined in the Act as "any addition of any pollutant to navigable waters from any point source."
 
 33 U.S.C. § 1362
 
 (12)(A).
 

 Kinder Morgan's gasoline pipeline unambiguously qualifies as a point source.
 
 [7]
 

 33 U.S.C. § 1362
 
 (14) (defining a point source to include a "pipe" or "conduit"). The plaintiffs claim that pollutants originating
 from this point source continue to be "added" to bodies of water that allegedly are navigable waters under the Act, including the two creeks in Anderson County, adjacent wetlands, Broadway Lake, Lake Secession, Lake Russell, and the Savannah River watershed. The CWA's language does not require that the point source continue to release a pollutant for a violation to be ongoing. The CWA requires only that there be an ongoing "addition ... to navigable waters," regardless whether a defendant's conduct causing the violation is ongoing.
 
 33 U.S.C. § 1362
 
 (12)(A).
 
 See
 

 Goldfarb
 
 ,
 
 791 F.3d at
 
 513 ;
 
 IBM Corp.
 
 ,
 
 216 F.3d at 254
 
 (noting under identical RCRA citizen suit provision that "defendant's current activity at the site is not a prerequisite for finding a current violation").
 

 The CWA's term "discharge of a pollutant" is a statutory term of art precisely defined in the CWA.
 
 Cf.
 

 Riverside Bayview Homes, Inc.
 
 ,
 
 474 U.S. at 133
 
 ,
 
 106 S.Ct. 455
 
 (noting that statutory definition of "navigable waters" in CWA makes ordinary meaning of those words less important). The definition does not place temporal conditions on the discharge of a pollutant from a point source. Nor does the definition limit discharges under the Act to additions of pollutants to navigable waters from a point source that continues actively to release such pollutants. Instead, the precondition for alleging a cognizable discharge of a pollutant is only that the plaintiff allege an ongoing addition to navigable waters originating from a point source.
 
 33 U.S.C. § 1362
 
 (12)(A). Moreover, as we explain below, the CWA is not limited to discharges of pollutants "directly" from the point source to navigable waters.
 
 See, e.g.
 
 ,
 
 Hawai'i Wildlife Fund v. Cty. of Maui
 
 , No. 15-17447,
 
 2018 WL 1569313
 
 , at *7-*8 (9th Cir. Feb. 1, 2018). Necessarily, when a discharge is indirect, there will be a delay between the time at which pollution leaves the point source and the time at which it is added to navigable waters. However, nothing in the CWA's language indicates that such a delay prevents the pollution from constituting an ongoing violation for purposes of a citizen suit, as long as pollutants continue to be "added" to navigable waters.
 
 See
 

 33 U.S.C. § 1362
 
 (12)(A). The plaintiffs have alleged such an ongoing addition here.
 

 The CWA is a strict liability statute.
 
 Friends of the Earth II,
 

 204 F.3d at 151
 
 . As noted above, Congress set forth in the Act its intention that "the discharge of pollutants into the navigable waters be eliminated,"
 
 33 U.S.C. § 1251
 
 (a)(1), not that the originating source of pollutants be corrected. Thus, remedial efforts taken in good faith "do[ ] not
 
 ipso facto
 
 establish the absence of federal jurisdiction over a citizen suit."
 
 Am. Canoe Ass'n v. Murphy Farms
 
 ,
 
 412 F.3d 536
 
 , 540 (4th Cir. 2005). To protect the nation's waters under the CWA, abatement of a pollutant requires more than the repair of a pipeline, and the need for such abatement continues so long as the contaminant continues to flow into navigable waters.
 
 See
 

 Gwaltney
 
 ,
 
 484 U.S. at 62
 
 ,
 
 108 S.Ct. 376
 
 (explaining that CWA's citizen suit provision has "the central purpose of permitting citizens to abate pollution"). Thus, the fact that a ruptured pipeline has been repaired, of itself, does not render the CWA violation wholly past.
 
 [8]
 

 Our conclusion is not altered by Kinder Morgan's citation to cases from other circuits. Those decisions were based on materially different facts. For example, in
 
 Hamker v. Diamond Shamrock Chemical Co.,
 
 the Fifth Circuit examined a complaint containing allegations of a discharge of oil into ground water from the defendant's pipe, rather than a discharge reaching navigable waters.
 
 See
 

 756 F.2d 392
 
 , 397 (5th Cir. 1985). As the court observed, the complaint alleged only that the discharged oil was "leaking into ground water" and "grasslands," not into navigable waters.
 
 [9]
 

 Id.
 

 Likewise, the Second Circuit held that continuing decomposition of "lead shot" in the Long Island Sound is not a "present violation" of the CWA.
 
 Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.
 
 ,
 
 989 F.2d 1305
 
 , 1312-13 (2d Cir. 1993). That holding pertained to whether the continuing effects of pollutants
 
 already
 
 "deposited" into a navigable water constituted a continuing violation.
 
 Id
 
 . at 1313. In contrast, the plaintiffs allege here that pollutants
 
 continue to be added to
 
 navigable waters, a violation encompassed within the Act's statutory definition. Accordingly, we conclude that the plaintiffs have alleged an ongoing violation of
 
 33 U.S.C. § 1311
 
 (a), and that the district court erred in dismissing their complaint for lack of subject matter jurisdiction.
 

 C.
 

 i.
 

 We turn to consider the question of first impression in this Circuit whether a discharge of a pollutant that moves through ground water before reaching navigable waters may constitute a discharge of a pollutant, within the meaning of the CWA. Initially, we observe that a discharge of a pollutant under the Act need not be a discharge "directly" to a navigable water from a point source. In
 
 Rapanos v. United States
 
 , the Supreme Court considered the kinds of connected waters covered by the CWA.
 
 See
 

 547 U.S. at 732-38
 
 ,
 
 126 S.Ct. 2208
 
 . Justice Scalia, writing for a plurality of four Justices, concluded that certain wetlands and intermittent streams did not themselves fall within the meaning of navigable waters under the CWA.
 
 [10]
 

 ibr.US_Case_Law.Schema.Case_Body:v1">See
 

 id.
 

 at 739
 
 ,
 
 126 S.Ct. 2208
 
 . However, when analyzing
 the kinds of connected waters that might fall under the CWA, Justice Scalia observed that "[t]he Act does not forbid the 'addition of any pollutant
 
 directly
 
 to navigable waters from any point source,' but rather the 'addition of any pollutant
 
 to
 
 navigable waters.' "
 

 Id.
 

 at 743
 
 ,
 
 126 S.Ct. 2208
 
 (quoting
 
 33 U.S.C. § 1362
 
 (12)(A) ). Accordingly, he observed that federal courts consistently have held that a discharge of a pollutant "that naturally washes downstream likely violates § 1311(a)."
 

 Id.
 

 (emphasis removed) (citing
 
 United States v. Velsicol Chem. Corp.
 
 ,
 
 438 F.Supp. 945
 
 , 946-47 (W.D. Tenn. 1976) ).
 

 The plain language of the CWA requires only that a discharge come "from" a "point source."
 
 See
 

 33 U.S.C. § 1362
 
 (12)(A). Just as the CWA's definition of a discharge of a pollutant does not require a discharge directly to navigable waters,
 
 Rapanos
 
 ,
 
 547 U.S. at 743
 
 ,
 
 126 S.Ct. 2208
 
 , neither does the Act require a discharge directly from a point source,
 
 [11]
 

 see
 

 33 U.S.C. § 1362
 
 (12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement ...
 
 has its beginning
 
 ." Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added);
 
 see also
 
 The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.
 

 To hold otherwise effectively would require that any discharge of a pollutant cognizable under the CWA be seamlessly channeled by point sources until the moment the pollutant enters navigable waters. The Second Circuit rejected such an interpretation of the CWA, and we agree with that court's reasoning. In
 
 Waterkeeper Alliance, Inc. v.EPA
 
 , the Second Circuit held that if courts required both the cause of the pollution
 
 and
 
 any intervening land to qualify as point sources, such an interpretation would, in practice, "impose a requirement not contemplated by the Act: that pollutants be channelized not once but twice before the EPA can regulate them."
 
 399 F.3d 486
 
 , 510-11 (2d Cir. 2005) ;
 
 see also
 

 Concerned Area Residents for Env't v. Southview Farm
 
 ,
 
 34 F.3d 114
 
 , 119 (2d Cir. 1994) (holding that liquid manure that passed from tankers through intervening fields to nearby waters constituted a discharge from a point source). The Ninth Circuit likewise rejected the theory that the CWA creates liability for discharges "only ... where the point source itself directly feeds into the navigable water-e.g., via a pipe or a ditch."
 
 Hawai'i Wildlife Fund
 
 ,
 
 2018 WL 1569313
 
 , at *7.
 

 The logic of
 
 Waterkeeper Alliance
 
 and
 
 Hawai'i Wildlife Fund
 
 is equally applicable here. The plaintiffs have alleged that the pipeline is the starting point and cause of pollution that has migrated and is migrating through ground water to navigable waters. Accordingly, we hold in agreement with the Second and Ninth Circuits that to qualify as a discharge of a pollutant under the CWA, that discharge need not be channeled by a point source until it reaches navigable waters.
 

 ii.
 

 Although we conclude that an indirect discharge may fall within the scope of the CWA, such discharges must be sufficiently connected to navigable waters to be covered under the Act. As the Ninth Circuit recently held, a discharge that passes from a point source through ground water to navigable waters may support a claim under the CWA.
 
 Hawai'i Wildlife Fund
 
 ,
 
 2018 WL 1569313
 
 , at *8. However, a discharge through ground water does not always support liability under the Act.
 

 Id.
 

 Instead, the connection between a point source and navigable waters must be clear.
 

 The EPA has developed the term "direct hydrological connection" to identify for purposes of the CWA whether there is a clear connection between the discharge of a pollutant and navigable waters when the pollutant travels through ground water. The EPA consistently has taken the position that the Act applies to discharges "from a point source via ground water that has a direct hydrologic connection to surface water." National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations,
 
 66 Fed. Reg. 2960
 
 , 3015 (proposed Jan. 12, 2001) [CAFOs Standards];
 
 see also
 
 Amendments to the Water Quality Standards Regulation That Pertain to Standards on Indian Reservations,
 
 56 Fed. Reg. 64,876
 
 , 64,892 (Dec. 12, 1991) ("[T]he Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters."). The assessment of the directness of a hydrological connection is a "factual inquiry," in which "time and distance" are relevant, as well as factors such as "geology, flow, and slope." CAFOs Standards,
 
 66 Fed. Reg. at 3017
 
 . This interpretation by the EPA of its statutory authority "warrants respectful consideration," especially in the context of a "complex and highly technical regulatory program."
 
 Wis. Dep't of Health & Family Servs. v. Blumer
 
 ,
 
 534 U.S. 473
 
 , 497,
 
 122 S.Ct. 962
 
 ,
 
 151 L.Ed.2d 935
 
 (2002) (citing
 
 Thomas Jefferson Univ. v. Shalala
 
 ,
 
 512 U.S. 504
 
 , 512,
 
 114 S.Ct. 2381
 
 ,
 
 129 L.Ed.2d 405
 
 (1994) );
 
 see also
 

 Riverside Bayview Homes, Inc.
 
 ,
 
 474 U.S. at 131
 
 ,
 
 106 S.Ct. 455
 
 .
 

 In light of the above considerations, we hold that a plaintiff must allege a direct hydrological connection between ground water and navigable waters in order to state a claim under the CWA for a discharge of a pollutant that passes through ground water.
 
 [12]
 
 This determination necessarily is fact-specific. In the present case, the plaintiffs have alleged that pollutants are seeping into navigable
 waters in Anderson County about 1000 feet or less from the pipeline. This extremely short distance, if proved, provides strong factual support for a conclusion that Kinder Morgan's discharge is covered under the CWA.
 
 See
 

 Sierra Club v. El Paso Gold Mines, Inc.
 
 ,
 
 421 F.3d 1133
 
 , 1137, 1148-50 (10th Cir. 2005) (holding that a discharge that passed through a 2.5-mile tunnel between mine shaft and navigable water could be covered under CWA).
 

 Also as a matter of undisputed fact, the ruptured pipeline caused the pollution at issue here. Kinder Morgan does not assert that the pollutants found in the creeks and wetlands have an independent or contributing cause. And this is not a case in which pollutants are diluted while passing through a labyrinth of underground "tunnel geology,"
 
 El Paso Gold Mines
 
 ,
 
 421 F.3d at 1150
 
 , or are otherwise diverted from their natural course,
 
 see
 

 Sierra Club v. Abston Constr. Co.
 
 ,
 
 620 F.2d 41
 
 , 45 (5th Cir. 1980) (holding that natural flow of "[g]ravity ... resulting in a discharge into a navigable body of water, may be part of a point source discharge if the [polluter] at least initially collected or channeled the water and other materials").
 

 Additionally, the plaintiffs have alleged a traceable discharge from the ruptured pipeline. The traceability of a pollutant in measurable quantities is an important factor in the determination whether a particular discharge is covered by the CWA.
 
 See
 

 Hawai'i Wildlife Fund,
 

 2018 WL 1569313
 
 , at *8 (holding that claim for indirect discharge must show that pollution is "fairly traceable" to the point source);
 
 El Paso Gold Mines
 
 ,
 
 421 F.3d at
 
 1140 n.4 (noting that pollution that is "not traceable to a single, identifiable source or conveyance" is nonpoint source pollution). And Kinder Morgan does not dispute that pollutants originating from the gasoline pipeline
 
 already
 
 have been detected in the waters of Anderson County.
 

 As we have noted, the CWA's stated purpose is "to restore ... the chemical, physical, and biological integrity of the Nation's waters,"
 
 33 U.S.C. § 1251
 
 (a), and the statute establishes a regime of zero tolerance for unpermitted discharges of pollutants,
 
 33 U.S.C. § 1311
 
 (a). In contrast, if the presence of a short distance of soil and ground water were enough to defeat a claim, polluters easily could avoid liability under the CWA by ensuring that all discharges pass through soil and ground water before reaching navigable waters. Such an outcome would greatly undermine the purpose of the Act. Thus, we hold that the plaintiffs plausibly have alleged a direct hydrological connection between the ground water and navigable waters to state a claim for a discharge of a pollutant under
 
 33 U.S.C. § 1311
 
 (a).
 

 We find no merit in Kinder Morgan's concern that our holding will result in unintended coverage under the CWA of any discharge of a pollutant into ground water. We do not hold that the CWA covers discharges to ground water itself. Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters located 1000 feet or less from the point source by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA.
 
 [13]
 
 Accordingly, the plain
 language and purpose of the Clean Water Act direct our conclusion in the present case that the district court has jurisdiction to entertain the plaintiffs' claim under
 
 33 U.S.C. § 1365
 
 (a), and that the plaintiffs have stated a claim for a violation of the Act's prohibition of the "discharge of any pollutant."
 
 33 U.S.C. § 1311
 
 (a).
 

 III.
 

 For these reasons, we vacate the district court's decision and remand the case for further proceedings consistent with this opinion.
 

 VACATED AND REMANDED
 

 Although Section 1311(a) refers to the "discharge of any pollutant" and Section 1362(12)(A) defines "discharge of a pollutant," we construe these two terms to be substantively identical and refer to the "discharge of a pollutant."
 

 Upstate Forever and the Savannah Riverkeeper are non-profit public interest organizations that operate in Anderson County, South Carolina, where the spill occurred. Upstate Forever has stated goals of developing clean water in the Upstate region of South Carolina, and the Savannah Riverkeeper works to restore the lakes and tributaries in the Savannah River watershed.
 

 Kinder Morgan does not challenge the plaintiffs' allegation that these waters, including Browns Creek, Cupboard Creek, and their adjacent wetlands, constitute navigable waters as defined by the CWA.
 
 33 U.S.C. § 1362
 
 (7).
 

 Kinder Morgan does not contend that gasoline and related contaminants are not pollutants under the CWA.
 
 See
 

 United States v. Hamel
 
 ,
 
 551 F.2d 107
 
 , 110-11 (6th Cir. 1977) (holding that the CWA definition of "pollutant" covers gasoline discharges).
 

 Had the plaintiffs alleged that ground water, of itself, falls within the meaning of navigable waters under the CWA, we would be confronting a distinctly different question here.
 
 See
 

 Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs
 
 ,
 
 531 U.S. 159
 
 , 180,
 
 121 S.Ct. 675
 
 ,
 
 148 L.Ed.2d 576
 
 (2001) (referring to "navigable waters" as a "traditional jurisdictional term"). However, in this case, the plaintiffs have alleged only that Kinder Morgan discharged pollutants "
 
 via
 
 hydrologically connected groundwater to surface waters" (emphasis added).
 

 We disagree with the dissent's view that our decision in
 
 Goldfarb
 
 is not helpful. We held in
 
 Goldfarb
 
 under an identical citizen suit provision that conduct causing a violation need not be ongoing to state a claim, so long as the violation itself is ongoing.
 
 791 F.3d at 513
 
 .
 

 Under the dissent's view, pollution becomes "nonpoint source pollution" not covered by the CWA at the moment when the point source no longer actively releases the pollutant.
 
 See, e.g.
 
 ,
 
 ONRC Action v. U.S. Bureau of Reclamation
 
 ,
 
 798 F.3d 933
 
 , 936 (9th Cir. 2015) (noting that the CWA provides no direct mechanism for regulating "nonpoint source pollution"). We are not persuaded by this argument, because the plaintiffs adequately have alleged that the pipeline is
 
 a
 
 point source of the discharge, which satisfies the CWA's requirement that the alleged pollution be "from
 
 any
 
 point source."
 
 See
 

 33 U.S.C. § 1362
 
 (12)(A) (emphasis added). Moreover, the cases relied on by the dissent show that nonpoint source pollution arises from "dispersed activities over large areas, and is not traceable to any single discrete source."
 
 See, e.g.
 
 ,
 
 League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren
 
 ,
 
 309 F.3d 1181
 
 , 1184 (9th Cir. 2002) ;
 
 see also
 
 33 U.S.C. 1314(f) (providing examples of nonpoint source pollution, including "agricultural and silvicultural activities"). The plaintiffs here allege that the pollution is traceable not to dispersed activities and nonpoint sources but to Kinder Morgan's pipeline, a discrete source.
 

 The dissent relies on
 
 Sierra Club v. El Paso Gold Mines, Inc.
 
 ,
 
 421 F.3d 1133
 
 (10th Cir. 2005), for its conclusion that this is an "ongoing migration" case that does not fall under the CWA's citizen suit provision. However, that court did not hold that an ongoing migration of pollutants cannot constitute a continuing violation of the CWA, but rather noted that the case before the court did not involve a simple ongoing migration of pollutants.
 

 Id.
 

 at 1140
 
 .
 

 Moreover, to the extent that
 
 Hamker
 
 's reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant,
 
 Hamker
 
 contravenes our decision in
 
 Goldfarb
 
 , and we decline to adopt the Fifth Circuit's approach.
 
 See
 

 Goldfarb
 
 ,
 
 791 F.3d at 513
 
 .
 

 The district court here rejected the plaintiffs' argument that the CWA covers a discharge through soil and ground water, because the court concluded that such an argument relies on an impermissible "Land is Waters" approach to CWA jurisdiction. In reaching this conclusion, the district court relied on the plurality opinion in
 
 Rapanos
 
 , which characterized the plaintiffs' theory there that "intermittent streams" were navigable waters as a so-called "Land is Waters" approach, and rejected that approach.
 
 547 U.S. at 732-34
 
 ,
 
 126 S.Ct. 2208
 
 . However, Justice Kennedy's controlling concurrence in
 
 Rapanos
 
 did not join the plurality in rejecting the plaintiffs' theory as a "Land is Waters" approach to CWA jurisdiction.
 
 547 U.S. at 768-70
 
 ,
 
 126 S.Ct. 2208
 
 ;
 
 United States v. Robertson
 
 ,
 
 875 F.3d 1281
 
 , 1292 (9th Cir. 2017) (holding that Justice Kennedy's "significant nexus" test controls after
 
 Rapanos
 
 ). Moreover, the "Land is Waters" theory in
 
 Rapanos
 
 involved whether certain bodies of water themselves qualified as navigable waters, which is not at issue here.
 
 547 U.S. at 739
 
 ,
 
 126 S.Ct. 2208
 
 (plurality opinion). Thus, irrespective whether a "Land is Waters" approach remains viable under the CWA following
 
 Rapanos
 
 , the plaintiffs' theory in the present case does not rely on such an approach.
 

 The dissent relies on cases that include language stating that a point source must "convey" or "introduce" pollutants to navigable waters.
 
 See, e.g.
 
 ,
 
 Miccosukee
 
 ,
 
 541 U.S. at 105
 
 ,
 
 124 S.Ct. 1537
 
 (observing that "a point source ... need only convey the pollutant to 'navigable waters' ");
 
 Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.
 
 ,
 
 273 F.3d 481
 
 , 491 (2d Cir. 2001) (stating that a "point source must introduce the pollutant into navigable water" (emphasis omitted) (citation omitted)). We disagree with any suggestion that these cases support the conclusion that the CWA requires a discharge from the point source directly to navigable waters. First, these cases simply did not confront the question of an indirect discharge of pollutants through land or ground water over time. Second, many of these cases were decided before
 
 Rapanos
 
 clarified that the CWA's language does not require a direct discharge.
 
 See
 

 547 U.S. at 743
 
 ,
 
 126 S.Ct. 2208
 
 ;
 
 Hawai'i Wildlife Fund
 
 ,
 
 2018 WL 1569313
 
 , at *7-*8. Finally, as we explain below, the point source here allegedly
 
 is
 
 "conveying" and "introducing" pollutants to the navigable waters, albeit indirectly, because it is the undisputed cause of the addition.
 

 The Ninth Circuit has held that an indirect discharge must be "fairly traceable" from the point source to navigable waters.
 
 Hawai'i Wildlife Fund,
 

 2018 WL 1569313
 
 , at *8 n.3. We see no functional difference between the Ninth Circuit's fairly traceable concept and the direct hydrological connection concept developed by EPA that we adopt today, which as we explain below includes a concept of traceability. In fact, the direct hydrological connection concept may be viewed as a narrower application of the same principle, addressing point source discharges
 
 through ground water
 
 .
 

 We also note that federal courts in several states, including some within this Circuit, have upheld in citizen suits the CWA's coverage of ground water-related discharges within those jurisdictions.
 
 See, e.g.
 
 ,
 
 Sierra Club v. Va. Elec. & Power Co.
 
 ,
 
 247 F.Supp.3d 753
 
 , 762 (E.D. Va. 2017) ;
 
 Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.
 
 ,
 
 2015 WL 2144905
 
 , at *8 (S.D.W. Va. May 7, 2015) ;
 
 Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC
 
 ,
 
 141 F.Supp.3d 428
 
 , 445 (M.D.N.C. 2015) ;
 
 see also
 

 Tenn. Riverkeeper v. Hensley-Graves Holdings, LLC
 
 , No. 2:13-CV-877-LSC, at 13-18,
 
 2013 WL 12304022
 
 (N.D. Ala. Aug. 20, 2013 ).